# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RHC OPERATING LLC,

                Plaintiff,

    v.

CITY OF NEW YORK, and BILL DE BLASIO, in his official capacity as Mayor of New York City, and New York City Council Members— Adrienne E. Adams, Alicka Ampry-Samuel, Diana Ayala, Justin L. Brannan, Selvena N. Brooks-Powers, Fernando Cabrera, Margaret S. Chin, Robert E. Cornegy, Jr., Laurie A. Cumbo, Ruben Diaz, Sr., Darma V. Diaz, Eric Dinowitz, Daniel Dromm, Mathieu Eugene, Oswald Feliz, James F. Gennaro, Vanessa L. Gibson, Mark Gjonaj, Barry S. Grodenchik, Robert F. Holden, Corey D. Johnson, Ben Kallos, Peter A. Koo, Karen Koslowitz, Brad S. Lander, Stephen T. Levin, Alan N. Maisel, Carlos Menchaca, Francisco P. Moya, Keith Powers, Kevin C. Riley, Carlina Rivera, Ydanis A. Rodriguez, Deborah L. Rose, Helen K. Rosenthal, Rafael Salamanca, Jr., Mark Treyger, Eric A. Ulrich, Paul A. Vallone, and James G. Van Bramer,

                Defendants.

Civil Action No. 1:21-cv-9322

**COMPLAINT**

i

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ...................................................................1

II.     PARTIES ...................................................................................................4

III.    JURISDICTION AND VENUE .................................................................5

IV.     FACTUAL BACKGROUND......................................................................6

      A.     The COVID-19 Pandemic Devastated New York City's Hotels and the
           Roosevelt Closed. ...............................................................................6

      B.     The Roosevelt Has Already Paid Millions of Dollars in Severance and
           Other Payments.....................................................................................8

      C.     The City Hastily Enacts the Severance Law.............................................13

      D.     The Poorly Drafted Severance Law is Vague............................................17

V.      THE UNCONSTITUIONAL NATURE OF THE SEVERANCE LAW..............20

      A.     ERISA preempts the Severance Law.........................................................20

      B.     The NLRA Preempts the Severance Law. ..................................................24

           i.     *Machinists* preemption.................................................................24

           ii.    *Garmon* preemption ....................................................................31

      C.     New York State Law preempts the Severance Law.....................................33

           i.     *Article 18 of the New York Labor Law* ..........................................34

           ii.    *Article 20 of the New York Labor Law* ..........................................35

      D.     The Severance Law Violates the Contract Clause. ....................................35

      A.     The Severance Law Violates the Due Process Clause.................................40

           i.     *Providing a social safety net for laid-off employees*.....................41

           ii.    *Incentivizing hotels to re-open to the public*................................43

      B.     The Severance Law Violates the Equal Protection Clause.........................44

VI.     COUNT ONE............................................................................................46

VII.    COUNT TWO...........................................................................................47

VIII.   COUNT THREE.......................................................................................47

IX.     COUNT FOUR.........................................................................................47

X.      COUNT FIVE ................................................................................................48

XI.     COUNT SIX ..................................................................................................48

XII.    COUNT SEVEN ............................................................................................49

XIII.   PRAYER FOR RELIEF .................................................................................50

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*520 S. Michigan Ave. Assocs., Ltd. v. Shannon,*
    549 F.3d 1119 (7th Cir. 2008) ...............................................................27, 29, 30, 31

*Aeroground, Inc. v. City & County of S.F.,*
    170 F. Supp. 2d 950 (N.D. Cal. 2001) .................................................................32

*Allied Structural Steel Co. v. Spannaus,*
    438 U.S. 234, 249-50 (1978) ...............................................................................38

*Ass'n of Car Wash Owners Inc. v. City of New York,*
    911 F.3d 74 (2d Cir. 2018)...................................................................................25

*AYDM Assocs., LLC v. Town of Pamelia,*
    205 F. Supp. 3d 252 (N.D.N.Y. 2016).................................................................45

*Chamber of Commerce v. Bragdon,*
    64 F.3d 497 (9th Cir. 1995) .................................................................................26

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)..............................................................................................44

*Concerned Home Care Providers, Inc. v. Cuomo,*
    783 F.3d 77 (2d Cir. 2015)...................................................................................25

*Conkright v. Frommert,*
    559 U.S. 506 (2010)..............................................................................................21

*Dimartile v. Cuomo,*
    478 F. Supp. 3d 372 (N.D.N.Y. 2020), *vacated as moot*, 834 Fed. Appx. 677
    (2d Cir. 2021)........................................................................................................46

*Ferran v. Town of Nassau,*
    471 F.3d 363 (2d Cir. 2006).................................................................................40

*Fort Halifax Packing Co. v. Coyne,*
    482 U.S. 1 (1987)..................................................................................................29

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
    841 F.3d 133 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2295 (2017)....................21

*Genco Importing, Inc. v City of New York,*
    552 F. Supp. 2d 371 (S.D.N.Y 2008)...................................................................40

*Gobeille v. Liberty Mut. Ins. Co.*,
    577 U.S. 312 (2016) ...................................................................................24

*Golden State Transit Corp. v. City of Los Angeles*,
    475 U.S. 608 (1986) ...................................................................................31

*Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Rels.*
    *Comm'n*,
    427 U.S. 132 (1976) ..............................................................................25, 47

*Massachusetts v. Morash*,
    490 U.S. 107 (1989) ...................................................................................22

*Melendez v. City of New York*,
    503 F. Supp. 3d 13 (S.D.N.Y. 2020) ..................................................38, 40

*Melendez v. City of New York*,
    No. 20-4238-CV, 2021 WL 4997666 (2d Cir. Oct. 28, 2021) .............38, 39

*Metropolitan Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985) ........................................................................26, 27, 29

*Neilson v. D'Angelis*,
    409 F.3d 100 (2d Cir. 2005) .......................................................................45

*NLRB v. Katz*,
    369 U.S. 736 (1962) ...................................................................................32

*Okun v. Montefiore Med. Ctr.*,
    793 F.3d 277 (2d Cir. 2015) .......................................................................22

*Pa. Nurses Ass'n v. Pa. State Educ. Ass'n*,
    90 F.3d 797 (3d Cir. 1996) .........................................................................32

*San Diego Bldg. Trades Council v. Garmon*,
    359 U.S. 236 (1959) ........................................................................25, 31, 47

*Sanitation & Recycling Indus., Inc. v. City of New York*,
    107 F.3d 985 (2d Cir. 1997) .......................................................................36

*Simas v. Quaker Fabric Corp. of Fall River*,
    6 F.3d 849 (1st Cir. 1993) ..........................................................................21

*Vaher v. Town of Orangetown*,
    916 F. Supp. 2d 404 (S.D.N.Y. 2013) .......................................................45

*Ex parte Young*,
    209 U.S. 123 (1908) ...................................................................................21

**State Cases**

*Albany Area Builders Ass'n v. Guilderland,*
    546 N.E.2d 920 (N.Y. 1989)........................................................................34

*Jancyn Mfg. Corp. v. County of Suffolk,*
    518 N.E.2d 903 (N.Y. 1987).......................................................................33

**Federal Statutes**

28 U.S.C. § 1331 ........................................................................................5

28 U.S.C. § 1367 ........................................................................................5

28 U.S.C. § 1391(b)(1) ................................................................................5

28 U.S.C. § 1391(b)(2) ................................................................................5

28 U.S.C. § 2201 ........................................................................................5

28 U.S.C. § 2202 ........................................................................................5

29 U.S.C. 1001§§ et seq.........................................................................*passim*

29 U.S.C. §§ 151-166 ...........................................................................*passim*

29 U.S.C. § 157 ........................................................................................25

29 U.S.C. § 158.............................................................................25, 32, 33

29 U.S.C. § 158(a)(5)...........................................................................31, 32

29 U.S.C. § 158(b)(3) ................................................................................32

29 U.S.C. § 158(d) ....................................................................................32

29 U.S.C. § 1002(1) ..................................................................................22

29 U.S.C. § 1002(3) ..................................................................................22

29 U.S.C. § 1003(a) ..................................................................................21

29 U.S.C. § 1144(a) ..................................................................................21

42 U.S.C. § 1983.............................................................................4, 48, 49, 50

American Rescue Plan Act of 2021, Pub. L. No. 117-2 § 9501 (2021) ........................................12

Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (codified at 15 U.S.C. § 9023(b)(3)(A)).......................................11, 12

**State Statutes**

Local Law, Int. No. 2397-A ..................................................................... *passim*

N.Y. City Charter § 36 ...............................................................................14

N.Y. Lab. L. § 550 ..................................................................................34, 47

N.Y. Lab. L. § 551 ..................................................................................34, 47

N.Y. Lab. L. § 570 .....................................................................................34

N.Y. Lab. L. § 591(6) .................................................................................34

N.Y. Lab. L. § 700 ................................................................................9, 35, 47

N.Y. MUN. HOME RULE L. § 10 .................................................................33

N.Y. MUN. HOME RULE L. § 20(4) .............................................................14

**Rules**

F.R.C.P. § 57 ...............................................................................................5

**Constitutional Provisions**

N.Y. CONST. art. IX, § 2(c) .........................................................................33

U.S. CONST. amend. XIV, § 2................................................................40, 44, 48

U.S. CONST., art. I, § 10, cl. 1 ...............................................................4, 35, 48

U.S. CONST. art. III .....................................................................................5

U.S. CONST. art. VI .....................................................................................20

**Other Authorities**

ADOPTING LOCAL LAWS IN NEW YORK STATE, NEW YORK DIVISION OF LOCAL GOVERNMENT SERVICES 13 (Sept. 2021) https://dos.ny.gov/system/files/documents/2021/09/adopting-local-laws-in-nys.pdf..............................................................................................................15

Anna Lucente Sterling, *What Happens To All of NYC's Empty Hotels?*, SPECTRUM NEWS 1 NY (Jan. 15, 2021), https://www.ny1.com/nyc/all-boroughs/news/2021/01/15/what-happens-to-all-of-nyc-s-empty-hotels-................7

Ben Miller, *Broadway show openings, U.S. Open help New York City hotels hit milestone*, NEW YORK BUSINESS JOURNAL (Sep 17, 2021), https://www.bizjournals.com/newyork/news/2021/09/17/broadway-show-openings-us-open-help-new-york-ci.html ................................................................................7

*Coronavirus Aid, Relief, and Economic Security ("CARES") Act*, NEW YORK STATE DEP'T OF LAB., https://dol.ny.gov/coronavirus-aid-relief-and-economic-security-cares-act (last visited Oct. 8, 2021) ..........................................................12

*File No. 2397-2021 A*, N.Y.C. COUNCIL, LEGISLATIVE RESEARCH CENTER https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5129961&GUID=24043573-28E5-4F9E-BA70-F4AA45A30487&Options=&Search= (last visited Oct. 19, 2021) ............................................................................................... *passim*

*Governor Cuomo Announces New York Ending COVID-19 State Disaster Emergency on June 24*, NEW YORK STATE (June 23, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24 ...........................................8, 15

Mark Sundstrom et al., *NY COVID latest: Tuesday, October 5, 2021*, PIX11 NEWS (Oct. 5, 2021), https://pix11.com/news/coronavirus/ny-covid-latest-tuesday-october-5-2021/ ....................................................................................8

NEW YORK CITY LEGISLATIVE DIVISION, BILL DRAFTING MANUAL 2 (2018), https://council.nyc.gov/legislation/wp-content/uploads/sites/55/2018/04/BDM-Final-2018-Version.pdf ...........................................14

*NY Hotel Trades Council Treat Their Own*, THE NEW YORK HOTEL TRADES COUNCIL EMPLOYEE BENEFIT FUND https://www.hotelfunds.org/ny-hotel-trades-council-treat-their-own/ (last visited Oct. 19, 2021) ....................................24

*NYC Hotel Occupancy, ADR & Room Demand*, NYC & COMPANY (Feb. 21, 2021), https://assets.simpleviewinc.com/simpleview/image/upload/v1/clients/newyorkcity/FYI_HotelPerformance_5Year_22821_dk_82d984c7-b953-4b74-a906-0db91402564b.pdf ..............................................................................................7

NYC Mayor's Office, *Mayor de Blasio Signs Bill Requiring Severance Pay for Hotel Service Employees*, YOUTUBE https://www.youtube.com/watch?v=JOjqCyYpP_E ............................................26

Rachael Rothman et al., *U.S. Lodging Demand Forecast to Return to Pre-Pandemic Levels By Fourth Quarter 2023*, CBRE GROUP, INC (July 20, 2021), https://www.cbre.us/about/media-center/us-lodging-demand-forecast-to-return-to-pre-pandemic--levels-by-fourth-quarter-2023 ......................................8

*Sept. 15, 2021 Hearing on Introduction 2397 Before the Comm. on Consumer Affs. and Bus. Licensing*, N.Y.C. Council at 15:16-16:4, 16:10-17, https://legistar.council.nyc.gov/View.ashx?M=F&ID=9856860&GUID=4378 5DE8-1AA3-460A-8070-9FF49802AC68 ..................................................................43

*The Story of the First Contract*, NY/NJ HOTEL & GAMING WORKERS UNION, https://hotelworkers.org/about/history/the-story-of-the-first-contract (last visited Oct. 19, 2021).......................................................................................................9

TRANSCRIPT: MAYOR DE BLASIO SIGNS LEGISLATION TO REQUIRE SEVERANCE PAY FOR HOTEL SERVICE EMPLOYEES, NYC https://www1.nyc.gov/office-of-the-mayor/news/674-21/transcript-mayor-de-blasio-signs-legislation-require-severance-pay-hotel-service-employees (published Oct. 5, 2021) .............................26, 34, 43

*Who We Are,* NY/NJ HOTEL & GAMING WORKERS UNION, https://hotelworkers.org/about/who-we-are (last viewed Oct. 19, 2021) ................................29

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, RHC Operating LLC ("**Plaintiff**"), by and through its undersigned attorneys, seeks declaratory and injunctive relief against Defendants, City of New York ("**City**"), Bill de Blasio, in his official capacity as the Mayor of the City  ("**Mayor**"), and New York City Council Members Adrienne E. Adams, Alicka Ampry-Samuel, Diana Ayala, Justin L. Brannan, Selvena N. Brooks-Powers, Fernando Cabrera, Margaret S. Chin, Robert E. Cornegy, Jr., Laurie A. Cumbo, Ruben Diaz, Sr., Darma V. Diaz, Eric Dinowitz, Daniel Dromm, Mathieu Eugene, Oswald Feliz, James F. Gennaro, Vanessa L. Gibson, Mark Gjonaj, Barry S. Grodenchik,  Robert F. Holden, Corey D. Johnson, Ben Kallos, Peter A. Koo, Karen Koslowitz, Brad S. Lander, Stephen T. Levin, Alan N. Maisel, Carlos Menchaca, Francisco P. Moya, Keith Powers, Kevin C. Riley, Carlina Rivera, Ydanis A. Rodriguez, Deborah L. Rose, Helen K. Rosenthal, Rafael Salamanca, Jr., Mark Treyger, Eric A. Ulrich, Paul A. Vallone, and James G. Van Bramer ("**Members**") (City, Mayor, and Members are collectively, "**Defendants**"), and hereby alleges as follows:

## I.   PRELIMINARY STATEMENT

1.      In this action, Plaintiff seeks injunctive and declaratory relief against a plainly unconstitutional and unlawful ordinance recently (and hastily) enacted by New York City.  If left undisturbed, this ordinance—which purports to compel certain hotel owners (including Plaintiff) to fund an additional 30 weeks of severance payments to certain laid-off employees—will violate Plaintiff's federal and state rights and cause Plaintiff to suffer immediate and crippling financial burdens and irreparable harm.  Plaintiff owns the Roosevelt Hotel (the "**Roosevelt**"), which closed to the public in December 2020 and has not re-opened due to economic conditions.

2.      The Roosevelt is managed and operated by a management company, Interstate

Hotels, LLC ("**Interstate**").  Pursuant to a Management Agreement, Interstate is the sole employer of all employees at the Roosevelt and is responsible for all matters relating to the management and operation of the Roosevelt. Plaintiff is responsible for funding the amounts necessary to operate the Roosevelt and indemnifying Interstate for such amounts, including the amounts due to employees for wages and/or other compensation.

3.      On October 5, 2021, the City enacted Local Law, Int. No. 2397-A ("**Severance Law**" or "**Law**"), which creates a mandatory post-employment, employer-funded benefit plan for union and non-union hotel employees at the municipal level.  **Exhibit 1**, Int. No. 2397-A.  Among other things, the Law requires that "hotel employers" of certain hotels in the City make $500 weekly severance payments to covered hotel service employees who were employed as of March 2020 for up to 30 weeks, *starting for the week of October 11, 2021*. Additionally, the Law provides that any hotel in the City that has closed permanently and converted to an alternate use, or is in the "process of converting," must pay covered hotel service employees a minimum of 20 paid days off for each year of service.

4.      The Law defines "hotel employers" as "any person who owns, controls or operates a hotel," thereby subjecting Plaintiff, as the owner of the Roosevelt, to such requirements.

5.      The vaguely drafted Severance Law was enacted less than one month after it was introduced, and it came on the heels of expiring unemployment benefits that had been granted as part of government-funded COVID-19 pandemic relief packages.  Very little open debate occurred about the Law, and there is no publicly available evidence that the Mayor or the City's legal department considered the constitutionality or legality of the Severance Law.  The Law was rushed through the legislative process through so-called "emergency" procedures, even though New York State was not under an executive state of emergency.

6.     Among other things, and as more fully alleged below, the Severance Law is preempted by the federal Employee Retirement Income Security Act of 1974 ("**ERISA**") and the federal National Labor Relations Act ("**NLRA**"). 29 U.S.C. 1001§§ et seq.; 29 U.S.C. §§ 151-166. The Law is preempted by ERISA because the mandated severance payments will impermissibly require Plaintiff and other hotel owners, managers, employers, and operators to implement a plan of ongoing discretionary decisions.  A complex administrative and financial system will be needed for determining a covered employee's initial eligibility, monitoring eligibility each week, calculating amounts owed, tracking amounts paid, and locating employees laid off over as far back as 18 months ago.

7.     Moreover, the Severance Law is preempted by the NLRA because it tramples the previously bargained-for rights and obligations of hotel employers like Interstate, and consequently hotel owners like Plaintiff who are responsible for funding such obligations, *vis a vis* union employees. Rather than follow the collective bargaining procedures required by the NLRA to obtain additional severance benefits, the New York Hotel and Motel Trades Council, AFL-CIO ("**Union**") rushed to City Council and successfully lobbied for additional hotel owner and employer payments.  Through its lobbying efforts, the Union sought to evade the plain terms of the Industry-Wide Agreement ("**IWA**"), a collective bargaining agreement, which the Union entered into with the Hotel Association of New York City, Inc. ("**HANYC**") in 2012.  **Exhibit 2**, IWA.  Indeed, the IWA specifically provides for severance payments, which payments Plaintiff has funded in full.   Through the Severance Law, Defendants have unilaterally—and unconstitutionally—amended the IWA by imposing substantial new severance obligations on hotel owners and employers throughout the City, including Plaintiff.

8.     In addition to being preempted by federal law, the Severance Law plainly runs afoul

of Plaintiff's rights under the United States Constitution.  For example, the Law imposes sudden, unanticipated, and severe retroactive obligations on Plaintiff and other hotels that upends the existing contractual relationship under the IWA.  Because the Law severely, permanently, and immediately changes the contractual relationship—irrevocably and retroactively—it violates the Contract Clause of the United States Constitution. U.S. CONST. art. I, § 10, cl. 1.

9.     By enacting and enforcing the Severance Law, acting under color of local law, Defendants have deprived Plaintiff of its rights under federal law and state law, including the United States and New York Constitutions.  Plaintiff respectfully requests a temporary restraining order, preliminary and final injunctive relief, declaratory relief, and attorneys' fees and costs pursuant to 42 U.S.C. § 1983.  Unless the Law is declared unconstitutional and permanently enjoined, Plaintiff will suffer irreparable harm in the form for excessive monetary payments that threaten its solvency and the depravation of its constitutional rights.

## II.     PARTIES

10.     Plaintiff is a limited liability company and the owner of the Roosevelt Hotel.  The sole member of RHC is Roosevelt Hotel Corporation, N.V., a Netherlands Antilles Company. The parent company of Roosevelt Hotel Corporation, N.V. is PIA Investments Limited, a company formed under the laws of Sharjah, United Arab Emirates and registered under British Virgin Island laws. The Roosevelt is an independent hotel located at 45 East 45th Street in New York City and has 1,015 hotel rooms.

11.     Defendant City is a municipality organized and existing under the laws of New York State.

12.     Defendant Mayor is the City's duly elected Chief Executive and is charged with enforcement of, among other things, the laws and ordinances of the City.  On October 5, 2021, the

4

Mayor signed the unconstitutional Severance Law into effect.

13.     Defendant Members were duly elected to the New York City Council, the legislative branch of the City.   The Defendant Members voted in favor of adopting the unconstitutional Severance Law on September 23, 2021.

### III.     JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).  Plaintiff seeks to prevent the City from further implementing or enforcing the Severance Law because it is preempted by federal law and because it violates Plaintiff's federal constitutional rights in numerous respects.

15.     This Court may exercise supplemental jurisdiction over claims arising from New York state law, including New York constitutional and preemption claims, pursuant to 28 U.S.C. § 1367. These state law claims arise from the same facts and circumstances as Plaintiff's federal law claims and are so related to those federal claims that they form part of the same case or controversy.

16.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 57.  A live, justiciable controversy exists between the parties regarding the implementation and enforcement of the Severance Law.  Plaintiff has suffered and—unless the Law is enjoined—will continue to suffer concrete, irreparable harms.  The Severance Law's effective date was October 11, 2021, and the first payments required under the Law became due on October 22, 2021.  This Court has jurisdiction to adjudicate this dispute under Article III of the U.S. Constitution.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)-(2).  The Severance Law was enacted by City Council and signed into law in this judicial district; the violations of

Plaintiff's rights occurred in this judicial district; the City is subject to this Court's personal jurisdiction and is deemed to reside in this judicial district; Defendant Mayor and Defendant Members are subject to this Court's personal jurisdiction and many reside in this judicial district; and the Roosevelt is located in this judicial district.

## IV.   FACTUAL BACKGROUND

### A.   The COVID-19 Pandemic Devastated New York City's Hotels and the Roosevelt Closed.

18.     In March 2020, New York City became the epicenter of the COVID-19 pandemic in the United States. On March 7, 2020, Governor Andrew Cuomo declared a state of emergency in New York State. Mayor de Blasio made a similar declaration on March 12, 2020, for New York City, and President Donald Trump declared a nationwide state of emergency on March 13, 2020. These and other declarations banned large gatherings, closed non-essential businesses like restaurants and bars, and imposed stay-at-home orders in New York City and across America. Furthermore, international travel was prohibited, and domestic travel was severely discouraged and curtailed.

19.     Such restrictions, as well as a widespread fear of infection, halted business travel and tourism to New York City. As a result, New York City's hotel room occupancy rates plummeted to under 35 percent for March 2020. Even though lockdown restrictions lifted in New York City and other areas later in 2020 and in 2021, *hotel occupancy rates have never returned to pre-pandemic levels*. For example, in December 2020, the occupancy rate for New York City's hotel rooms was just 36%, with an average daily rate of $130.  By comparison, in December 2019,

there was a 91% occupancy rate and $351 daily rate in New York City hotels.[1]  The Roosevelt in particular was running at a nearly 97% occupancy rate before being hit with the consequences of the COVID-19 pandemic.

20.     More recently, over the 2021 Labor Day week, occupancy rates rose to 67.3% with an average daily rate of $238.78—still far below pre-pandemic levels. While these numbers may indicate that the industry is trending in the right direction, a comparison to Labor Day week in 2019 (occupancy rate of 89.9% and average daily rate of $294.03) demonstrates that hotels are still suffering.[2]  Indeed, as of January 2021, 200 of New York City's 700 hotels that were in existence as of March 2020 were still closed, either indefinitely or permanently.[3]

21.     The Roosevelt Hotel did not escape the crippling effects of the pandemic.  Plaintiff was ultimately left with no choice but to make the decision to close the Roosevelt. In October 2020, the Roosevelt announced that it would be closing in December 2020 due to the financial losses it incurred from the coronavirus pandemic. The Roosevelt had almost 500 employees at the time, most of whom were furloughed in March 2020. With Plaintiff's decision to close the Roosevelt, Interstate was forced to lay off all remaining employees, except for a limited number of essential security and maintenance employees. The Roosevelt remains closed to the public. There are currently no plans to re-open, sell, or transition the Roosevelt to an alternative use as of the date of this Complaint.

---

[1]     *NYC Hotel Occupancy, ADR & Room Demand*, NYC & COMPANY (Feb. 21, 2021), https://assets.simpleviewinc.com/simpleview/image/upload/v1/clients/newyorkcity/FYI_HotelPe rformance_5Year_22821_dk_82d984c7-b953-4b74-a906-0db91402564b.pdf.

[2]     Ben Miller, *Broadway show openings, U.S. Open help New York City hotels hit milestone*, NEW YORK BUSINESS JOURNAL (Sep 17, 2021), https://www.bizjournals.com/newyork/news/2021/09/17/broadway-show-openings-us-open-help-new-york-ci.html.

[3]     Anna Lucente Sterling, *What Happens To All of NYC's Empty Hotels?*, SPECTRUM NEWS 1 NY (Jan. 15, 2021), https://www.ny1.com/nyc/all-boroughs/news/2021/01/15/what-happens-to-all-of-nyc-s-empty-hotels-.

22.     By Spring 2021, cases of COVID-19 and related hospitalizations in New York City and other parts of the United States dropped dramatically. On June 24, 2021, Governor Cuomo ended New York State's state of emergency.[4] On October 5, 2021—the same day that Mayor de Blasio signed the Severance Law—New York City reported its lowest 7-day positivity rate.[5]

23.     Although many restrictions have now been lifted (*e.g.*, no capacity restrictions or curfews) in New York City and around the United States, travel hesitancy continues to deter tourism.   Moreover, because business travel and group events account for the vast majority of New York City's hotel bookings, and because most employees are continuing to work from home or utilize virtual gathering spaces, like Zoom, the economic outlook for hotels remains bleak. Recovery for the hotel industry is expected to be protracted. In fact, industry experts estimate that New York City's hotels will not return to pre-pandemic levels of occupancy until 2025.[6]

**B.     The Roosevelt Has Already Paid Millions of Dollars in Severance and Other Payments.**

24.     HANYC negotiated and bargained with the Union on behalf of hotel employers, resulting in the IWA, which has been in effect since July 1, 2012.  Ex. 2.

25.     The IWA is a master union contract that covers 28,000 union members, including employees of the Roosevelt and employees working in various hotels and motels, large and small, throughout New York City.  The Union was originally formed in 1938 and the first collective

---

[4]     *Governor Cuomo Announces New York Ending COVID-19 State Disaster Emergency on June 24*, NEW YORK STATE (June 23, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24.

[5]     Mark Sundstrom et al., *NY COVID latest: Tuesday, October 5, 2021*, PIX11 NEWS (Oct. 5, 2021), https://pix11.com/news/coronavirus/ny-covid-latest-tuesday-october-5-2021/.

[6]     Rachael Rothman et al., *U.S. Lodging Demand Forecast to Return to Pre-Pandemic Levels By Fourth Quarter 2023*, CBRE GROUP, INC (July 20, 2021), https://www.cbre.us/about/media-center/us-lodging-demand-forecast-to-return-to-pre-pandemic--levels-by-fourth-quarter-2023.

bargaining agreement was signed January 18, 1939.[7]  The Union is the predominate collective bargaining representative of union-based hotels in New York City.  For decades, the Union has engaged in collective bargaining with New York City hotel employers, owners, and operators under the requisite procedures of the NLRA and Article 20 of New York State Labor Law.

26.     The Union and HANYC negotiated on the subject of severance payments and came to a collectively-bargained-for agreement.   Specifically, Article 52 of the IWA provides that employees are entitled to severance pay, "[i]n the event of termination resulting from the closing of a hotel or a restaurant therein or a department thereof, or a concession." ("**Article 52 Severance**"). Ex. 2 at Art. 52.

27.     If Article 52 Severance pay is triggered, employers must pay an amount equal to four (4) days of regular wages for each year of service for each affected employee—provided the employee was employed for at least six months—plus "a further payment equal to twenty-five percent (25%) of [the severance] amount" to employee benefit funds administered by the New York Hotel Trades Council and Hotel Association of New York City, Inc. Employee Benefit Funds (the "**Fund**").[8] Ex. 2 at Art. 52.

28.     Article 26 of the IWA requires, among other things, that disputes involving questions, interpretation, or application of the IWA, arbitrability, or "any acts, conduct or relations between the parties, directly or indirectly . . . shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson" and hearings are held at the Office of the Impartial Chairperson ("**OIC**"). Ex. 2 at Art. 26. On or around March 19, 2020, at the outset of the pandemic

---

[7]     *The Story of the First Contract*, NY/NJ Hotel & Gaming Workers Union, https://hotelworkers.org/about/history/the-story-of-the-first-contract (last visited Oct. 19, 2021).

[8]     Information about the Fund is available at https://www.hotelfunds.org/.

and at the urging of the Union, the OIC issued an arbitration award in favor of the Union that required employers bound by the IWA to continue making health benefit contributions to the Fund for up to four months on behalf of any employee laid off as a result of the closure of a hotel as a result of the Coronavirus threat. *See* **Exhibit 3**, March 19, 2020 OIC Arbitration Award at p. 15.

29.      Pursuant to Article 26, the Union requested a hearing on an emergency basis seeking a declaratory judgment that closures and layoffs caused by the Coronavirus crisis trigger IWA Article 52, even where a hotel had not yet indicated that it was closing. The main issue before the OIC was when a closure or layoff is of sufficient duration to trigger Article 52 severance obligations "resulting from the closing of a hotel." The IWA does not define when a layoff or closure becomes permanent such that the hotel is "closed", and Article 52 is triggered. Upon finding that "the request for a declaratory judgment (award) regarding severance pay is squarely within the jurisdiction of [the OIC], both by a plain reading of [Article 26] and by precedential awards issued by Chairpersons," the OIC declined to find that all "employees laid off as a result of the closure of a hotel, outlet, department, or shift as a result of the Coronavirus threat" had suffered a layoff of sufficient duration to consider the hotel "closed" thereby triggering Article 52. Instead, the OIC awarded the four months of continuing health benefit contributions for such employees finding that this remedy "balances the interest of the parties within the confines of the contractual language and precedent." The March 19, 2020 award did not address the scenario where a hotel decides to "permanently" close and thereby trigger Article 52.

30.      However, on September 11, 2020, the OIC issued another award applying the March 19, 2020 award to the Omni Berkshire Place Hotel following its announcement on or about June 8, 2020 that it would be closing. The Omni, which had paid two of the four payments required under the March 19 award before closing and triggering Article 52 severance, argued that it was

not obligated to pay the full 25% contributions under Article 52, but instead should receive a credit towards such amount for the two payments made pursuant to the award. The OIC agreed and ruled that the hotel was entitled to a credit for amounts already paid. *See* **Exhibit 4**, September 11, 2020 OIC Arbitration Award at p. 6.  This ruling provided guidance to similarly situated hotels or other hotels that might become similarly situated in the future like the Roosevelt.

31.    Pursuant to Article 52 and the OIC's two arbitration awards, since the Fall and Winter of 2020, the Plaintiff has funded and the Roosevelt has paid its laid off employees their bargained-for Article 52 Severance in excess of $8 million, *as well as* the 25% benefit contribution required under Article 52 in excess of $1.9 million, *as well as* the additional four months of continuing health benefit contributions in the amount of $2.6 million, *as well as* accrued but unused paid time off (as further required under the IWA) in excess of $2.9 million.  Thus, all told, Plaintiff has already funded more than $15.4 million in payments pursuant to the IWA and the OIC awards.

32.    As of September 15, 2021, all members of HANYC had paid severance to Union members in the estimated collective total of $500 million.[9]

33.    In addition to the numerous and substantial benefits that Union members received under the IWA, hotel workers across New York City also received expanded unemployment benefits. In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which extended eligibility for New York State unemployment benefits for an additional 53 weeks beyond the 26 weeks already provided under New York law (Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281

---

[9]    *File No. 2397-2021 A*, N.Y.C. COUNCIL, LEGISLATIVE RESEARCH CENTER https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5129961&GUID=24043573-28E5-4F9E-BA70-F4AA45A30487&Options=&Search= (last visited Oct. 19, 2021) (follow "Hearing Testimony 9/15/2021" hyperlink and scroll to third page).

(codified at 15 U.S.C. § 9023(b)(3)(A))), or through September 5, 2021. The CARES Act also augmented the amount of unemployment benefits by $600 per week from March 2020 to the end of July 2020, and provided for a supplemental $300 per week from January 2021 until September 5, 2021.[10]  The Roosevelt, on the other hand, has paid millions of dollars in taxes (in addition to the millions of dollars it has paid directly to its laid off employees) since the start of the pandemic, yet it has not received any financial assistance from any governmental sources.

34.     The Fund also received substantial federal aid as part of pandemic relief efforts. Pursuant to section 9501 of the American Rescue Plan Act of 2021, the Fund was provided a tax credit for offsetting the costs of extending free COBRA coverage to its beneficiaries, who are the same hotel employees benefiting from the Severance Law.  American Rescue Plan Act of 2021, Pub. L. No. 117-2 § 9501 (2021).

35.     The Union has shown a clear pattern of demanding benefits beyond what it was able to negotiate at the bargaining table via collective bargaining *and* beyond what employees would otherwise be able to receive under the CARES Act and State unemployment benefits laws, without regard to the enormous costs that would be imposed on struggling hotel employers, operators, and owners like Plaintiff.[11]

36.     Lobbying Defendants for the unconstitutional Law is just the latest example of the Union's tactics.  Earlier, in December 2020, the Union requested an "emergency" hearing and

---

[10]     Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (codified at 15 U.S.C. § 9023(b)(3)(A)); *see also Coronavirus Aid, Relief, and Economic Security ("CARES") Act*, NEW YORK STATE DEP'T OF LAB., https://dol.ny.gov/coronavirus-aid-relief-and-economic-security-cares-act (last visited Oct. 8, 2021).

[11]     Since the announcement of the Roosevelt's closure, and similar announcements of closures and layoffs at other hotels, and still to this day, the Union has engaged in a pattern of utilizing Article 26 to request "emergency hearings" before the OIC. By way of example only, since around October 2020, the Union has requested in excess of a dozen hearings before the Impartial Chairperson on an "emergency" basis.

went so far as to demand the Roosevelt to *delay* Article 52 severance payments under the IWA into 2021, so that Union members could evade limitations imposed on eligibility for New York State unemployment benefits.  Pursuant to a December 31, 2020 arbitration award from the OIC, the Roosevelt paid severance in accordance with the demanded delay.  Delaying the payment of the severance cost Plaintiff approximately an additional $50,000, because the delay triggered a whole new year's set of increased federal payroll taxes and similar restart costs.

37.     Thus, covered hotel employees at the Roosevelt not only received the full benefit of Article 52 Severance (plus additional contributions on their behalf to the Fund to continue their health benefits), but also received the full benefit of state unemployment benefits for which they otherwise would have been ineligible. This Law now seeks to give such employees—regardless of their current employment status with another employer or change in circumstances, such as becoming eligible for social security—the full benefit of *another* set of severance benefits which were neither bargained for nor awarded by the OIC.

C.     **The City Hastily Enacts the Severance Law.**

38.     On September 9, 2021, just days after the CARES Act's expanded unemployment benefits expired, Defendant Member Francisco P. Moya proposed the first version of the Severance Law to the City Council.[12]  On September 15, 2021, the bill was discussed by the Committee on Consumer Affairs and Business Licensing. At that hearing, only three city officials and four laid-off hotel industry workers spoke about the bill. No hotel employers or owners were heard and no information about the bill's effect on the industry was presented or even inquired about.

---

[12]     *File No. 2397-2021 A*, N.Y.C. COUNCIL, LEGISLATIVE RESEARCH CENTER https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5129961&GUID=24043573-28E5-4F9E-BA70-F4AA45A30487&Options=&Search= (last visited Oct. 19, 2021).

39.     At the September 15 hearing, Defendant Moya asserted the need to "protect workers" in the wake of the end of their federal unemployment benefits, and stated "we need to incentivize an incremental reopening" of the hotel industry.[13] Interestingly, Deputy General Counsel for the Department of Consumer and Worker Protection, Michael Tiger, stated that the Administration "supports the *intent* of the legislation," but he did not comment on the approach or the legality of the requirements imposed on hotels.[14]

40.     While the legality of other bills was openly debated[15] during the September 15 hearing, no consideration was given to the constitutional or legal implications of the Severance Law or the complicated administration of paying out such severance benefits, much less the rights or financial struggles of hotel owners and employers.  The 90-minute September 15 hearing and a 20-minute September 23 hearing were the *only times* that the Severance Law was openly discussed by City Council members.

41.     On September 21, 2021, the Mayor issued a "Message of Necessity," allowing the bill to avoid the normal "aging" requirement that City Council members be allowed seven days to review a bill prior to passage.[16] *See* N.Y. MUN. HOME RULE L. § 20(4) (2015); Charter § 36.[17]

---

[13]     *File No. 2397-2021 A*, N.Y.C. COUNCIL, LEGISLATIVE RESEARCH CENTER at 15:16-16:4, 16:10-17     https://legistar.council.nyc.gov/View.ashx?M=F&ID=9856860&GUID=43785DE8-1AA3-460A-8070-9FF49802AC68 (follow "Hearing Transcript 9/15/21" hyperlink then view pincites).

[14]     *Id.* at 24:4-10.

[15]     *Id.* at 36:19-38:4 (discussing legality of non-compete agreements and history of prior regulation).

[16]     *File No. 2397-2021 A*, N.Y.C. COUNCIL, LEGISLATIVE RESEARCH CENTER, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5129961&GUID=24043573-28E5-4F9E-BA70-F4AA45A30487&Options=&Search= (last visited Oct. 19, 2021) (follow "Message of Necessity" hyperlink).

[17]     NEW YORK CITY LEGISLATIVE DIVISION, BILL DRAFTING MANUAL 2 (2018), https://council.nyc.gov/legislation/wp-content/uploads/sites/55/2018/04/BDM-Final-2018-Version.pdf; N.Y. MUN. HOME RULE L. § 20(4); Charter § 36.

This expedited procedure was instituted despite the fact that (a) the "Message of Necessity" power is meant to be an "Emergency Procedure," [18] and (b) the State (and therefore the City) was no longer in a state of emergency.[19]

42.     On September 23, 2021, the Committee on Consumer Affairs and Business Licensing approved various amendments to the bill,[20] but there was no hearing held to allow for public comment on the amended version of the bill.

43.     Later that same day, the bill went before the entire City Council for a vote.  At that 80-minute meeting—during which eight bills were voted on—the only person to speak about the Severance Law was Defendant Moya. He noted the challenge that the pandemic had on the hotel workforce and stated that the bill "creates an opportunity to [] put thousands back to work . . . and creates an opportunity to incentivize and revitalize" New York City's hotel industry.[21] The Severance Law was passed by the City Council by a vote 40 to 3.

44.     The bill's paper legislative history indicates that there was *no analysis* of the constitutionality of the Law, or the financial impact or administrative burdens imposed on hotels as a result of the Law.  The September 15 and 23, 2021 Committee Reports are 30 pages each, of

---

[18]     *See* ADOPTING LOCAL LAWS IN NEW YORK STATE, NEW YORK DIVISION OF LOCAL GOVERNMENT SERVICES 13 (Sept. 2021) https://dos.ny.gov/system/files/documents/2021/09/adopting-local-laws-in-nys.pdf.

[19]     *Governor Cuomo Announces New York Ending COVID-19 State Disaster Emergency on June 24*, NEW YORK STATE (June 24, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24.

[20]     *File No. 2397-2021 A*, N.Y.C. COUNCIL, LEGISLATIVE RESEARCH CENTERhttps://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5129961&GUID=24043573-28E5-4F9E-BA70-F4AA45A30487&Options=&Search= (follow 9/23/2021 "Amended by Committee" and "Approved by Committee" hyperlinks titled "Meeting Details").

[21]     *File No. 2397-2021 A*, N.Y.C. COUNCIL, LEGISLATIVE RESEARCH CENTER at 52:2-24, https://legistar.council.nyc.gov/View.ashx?M=F&ID=9856860&GUID=43785DE8-1AA3-460A-8070-9FF49802AC68 (follow "Hearing Transcript 9/23/21" hyperlink then view pincite).

which only two full pages (or four paragraphs) discuss the hotel industry in New York City generally. **Exhibit 5**, Committee Reports at pp. 22, 17 respectively. Remarkably, the Committee Reports (Ex. 5 at pp. 24 and 19) acknowledged changed conditions from 2017 due to the COVID-19 pandemic, and candidly state that, "the hotel industry remains in dire straits. If hoteliers are unable to stay afloat, there is serious concern that they will be forced into bankruptcy or sell. While this may help the individual hotelier, this puts hotel workers in a precarious state." Despite recognizing that hotels in New York City are in "dire straits," Defendants plowed ahead and passed a bill at the Union's behest—a bill that seeks to extract hundreds of millions of dollars in additional severance obligations from New York City's struggling hotels.

45.     It is astonishing that Defendant Members of the Committee on Consumer Affairs and Business Licensing would suggest that bankruptcy is good for anyone, but even more astonishing that in mentioning bankruptcy they ignored the fact that such a negative event may likely be brought on by the very severance pay obligations they were imposing. More consideration was owed to the fact that hotels could go bankrupt as a result of the Severance Law because in the end the Law could end up hurting the very hotel workers this Law was intended to protect as reorganization could lead to the termination of any unionized workers' pension benefits, and liquidation always leads to such termination.

46.     On October 5, 2021, at the conclusion of a brief 30-minute signing ceremony that purported to be a public hearing, Mayor de Blasio signed the bill into law. The bill was enacted less than one month after it was first introduced by Defendant Moya. The first payments required by the Severance Law became due on October 22 for the week of October 11-17, 2021.

47.     On November 1, 2021, the Union sent a letter to the Roosevelt demanding that the Roosevelt advise of the status of severance payments under the Law and emphasizing the Law's

penalty of double the amount of severance pay owed to employees if the Roosevelt fails to make the payments. **Exhibit 6**, Union Nov. 1 Letter.

D.     **The Poorly Drafted Severance Law is Vague.**

48.     The Severance Law requires "hotel employers" of "transient hotels" that, as of March 1, 2020, had 100 or more rooms ("Targeted Hotel Employers"), to make $500 weekly severance payments to "covered hotel service employees" for a period of up to 30 weeks, starting October 11, 2021, if (a) the employee was part of a "mass layoff"—defined as the hotel laying off more than 75% of its employees engaged in "hotel service" in any 30-day period after March 1, 2020, or (b) the hotel is closed to the public and has not, by October 11, 2021, recalled 25% of its employees that were employed as of March 1, 2020, and reopened the hotel to the public by November 1, 2021.

49.     Additionally, for those hotels that have closed permanently *and* converted to an alternate use, or are in the process of converting, the Severance Law requires that "covered hotel service employees" be paid a minimum of 20 paid days off for each year of service.  The Law does not provide a deadline for this 20-day payment.

50.     The Severance Law is a web of vague and undefined terms. For example, "closed permanently" is not defined or explained in the Law, nor does the Law articulate what is required to be "in the process" of converting to a new use.  Hotels, including the currently-closed Roosevelt, will be left to guess as to what triggers a "process."  Do mere internal discussions exploring a business plan to covert constitute a process?  What about consideration of an offer for the hotel's purchase, or entering into a contract (but not necessarily converting, selling, or transferring)?  The Law does not provide answers to these important questions.

51.     Even where it is undisputed that a hotel is "closed permanently," the Law does not

define the term "per year of service," which is necessary to perform the severance calculation of "an amount that equals no less than pay for 20 days per year of service, at the same rate that such employee is paid for paid days off." It is undefined whether a hotel should use "per year of service" to the hotel or "per year of service" to the current hotel employer. The Law does not define "per year of service" where the service to the hotel employer is less than the years of service performed at the hotel (which may be exacerbated by the fact that that the current hotel employer has no records from any prior hotel employer) or where the years of service to the hotel employer covers multiple hotels. The Law also does not address where such years are not contiguous, and gaps are due to an employee voluntarily quitting. It also does not address situations in which the years of service included both covered and exempted positions.

52.    As an additional example, the Law provides that the severance payments required thereunder may be reduced if an employee is already receiving severance "or similar pay" from the "hotel employer," but "similar pay" is left entirely undefined.

53.    And as yet another example of the Law's vagueness, a "covered hotel service employee" is defined as an employee who was: (a) "employed" by a hotel on March 1, 2020; (b) employed for at least one year prior; (c) performed "hotel service"; (d) was "not a managerial, supervisory or confidential employee"; and (e) was laid off after March 1, 2020, due to a "closure or mass layoff."  "Hotel service" is unhelpfully defined as "work performed in connection with the operation of a hotel."   Vendors and concessionaires operate bars and restaurants and provide other services for hotels, such as valet, coat check, night cleaning, etc. Sometimes they have joint operations with the hotels. Some workers are not on the hotel payroll but have been at the hotel for years and could argue that they performed worked "in connection with the operation of a hotel" to be a covered employee.  Must Plaintiff pay severance to these vendors and concessionaires

under the Law?

54.    Further, the Law fails to address employees who were terminated for cause, employees who left voluntarily, employees who were recalled and declined to return, or individuals who work for vendors or concessionaires.

55.    What constitutes a "confidential employee" is also vague.  The Law does not define whether these exemptions are determined by job title, duties, compensation, or otherwise. It is undefined whether the drafters intended to use the NLRA definition of "confidential employee" or some other definition. A "confidential employee" can have any number of various meanings. Many, many different types of hotel employees may have access to confidential, proprietary, or sensitive information.  Is a human resources employee a "confidential employee" by virtue of having access to employee social security numbers, protected health information, employee complaints and grievances?  Is an employee in a hotel's accounting department a "confidential employee" by virtue of having access to proprietary data concerning the hotel's financials?  Is a front desk clerk a "confidential employee" by virtue of having access to sensitive customer information, such as credit card information, home addresses?  Is a member of the security staff a "confidential employee" by virtue of having access to security and access codes?  The text of the Law does not answer these questions.  Plaintiff is left to guess as to the correct answers and risks litigation for guessing incorrectly.

56.    As a result of the Law's hopelessly vague nature, "hotel employers," including hotel owners like Plaintiff, will have to use considerable resources and exercise discretion and good faith in making difficult decisions to determine eligibility and calculate payment amounts. For example, Plaintiff will have to dedicate substantial resources to ascertain—for each of the approximately 478 laid-off employees—whether he or she has received or is owed other severance

payments "or similar pay" that would reduce the $500 weekly commitment.  But only after Plaintiff attempts to decipher the meaning of "similar pay," and only after engaging in a guessing game about whether the person was in management or was a "confidential employee," etc.

57.    Disagreements as to eligibility and payment amounts will inevitably arise—all the more so given the Law's vagueness.  When this occurs, the Severance Law creates a private cause of action for any covered employee to sue his or her "hotel employer," like Plaintiff, in the New York State Supreme Court and potentially recover double damages and attorneys' fees.  This private right of action will likely lead to a flood of litigation, burden the courts, create enormous exposure for hotel employers, operators, and owners, and require hotels to create a costly infrastructure to defend and finance this litigation.[22]

58.    Because the Severance Law creates ongoing requirements until it expires on June 1, 2022, and thereafter in the form of claims, counterclaims and increased litigation and arbitration, Targeted Hotel Employers will need to set aside substantial reserves and establish and maintain administrative systems to calculate and monitor the payments on a weekly basis.  To do so, hotels—even those such as the Roosevelt that remain closed to the public and generate little-to-no revenue—will have to expand their administrative departments or build them from the ground up.

## V.    THE UNCONSTITUIONAL NATURE OF THE SEVERANCE LAW

### A.    ERISA preempts the Severance Law.

59.    The Supremacy Clause of the United States Constitution states that the "Laws of the United States … shall be the supreme Law of the Land." U.S. CONST. art. VI.  Federal courts have long recognized a cause of action in equity to prohibit the enforcement of state and local laws

---

[22]    Relatedly, the Severance Law does not rid the mandatory arbitration provision in Article 26 of the IWA, giving Union employees yet another avenue, *vis a vis* the Union, to try to hold their "hotel employer" liable and seek penalties, and potentially expose "hotel employers" to conflicting judgments or liabilities well beyond the Law's limits.

that run afoul of the Supremacy Clause. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2295 (2017); *see also Ex parte Young*, 209 U.S. 123, 155-63 (1908).

60.     Congress enacted ERISA to regulate employee benefit plans established or maintained by private employers or employee organizations nationwide. 29 U.S.C. § 1003(a). Although ERISA does not itself provide substantive benefits, Congress sought to encourage the creation of employee benefit plans under "a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010).[23]   In other words, "ERISA induces employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Id.*

61.     To achieve uniformity, ERISA includes an express and expansive preemption clause, which provides that ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) and not exempt under section 1003(b)." 29 U.S.C. § 1144(a).[24]  A local law, like the Severance Law, "that obligates an employer to establish an employee benefit plan is itself preempted even though ERISA itself neither mandates nor forbids the creation of plans." *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 852 (1st Cir. 1993).

---

[23]     Unless noted otherwise, internal quotations and citations have been omitted.

[24]     The Severance Law enacted by the City falls expressly within the definition of "State law," which is defined to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State," with "State," in turn, including "*any political subdivisions thereof*, or any agency or instrumentality of either, which purports to regulate directly or indirectly, the terms and conditions of employee benefit plans covered by [ERISA]." *Id.* § 1144(c)(1)-(2) (emphasis added).

62.     ERISA defines "employee benefit plan" as an "employee welfare benefit plan or an employee pension benefit plan or a plan which is both."  29 U.S.C. § 1002(3).  ERISA also defines "employee welfare benefit plan" as follows:

any plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries ... benefits in the event of sickness, accident, disability, death or unemployment, or ... any benefit described in section 186(c) of this title.  29 U.S.C.  § 1002(1).

The Second Circuit has stated that "use of the word 'any' and inclusion of three undefined, overlapping descriptors (plans, funds, and programs) suggests that Congress intended the definition of 'employee welfare benefit plan' to be broad and independent of the specific form of the plan."  *Okun v. Montefiore Med. Ctr.,* 793 F.3d 277, 279 (2d Cir. 2015).

63.     "[P]lans to pay employees severance benefits, which are payable *only* upon termination of employment, are employee welfare benefit plans within the meaning of the [ERISA]." *Massachusetts v. Morash*, 490 U.S. 107, 116 (1989).  A severance plan is governed and preempted by ERISA if it requires an "ongoing administrative program or scheme." *See Okun*, 793 F.3d at 279. To determine whether the required action "involves the kind of ongoing administrative scheme inherent in a plan, fund or program," the Second Circuit has developed three non-exclusive factors:

(1) whether the employer's undertaking or obligation requires managerial discretion in its administration; (2) whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits; and (3) whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria.  *Id.*

64.     All three factors are satisfied here. With respect to the first factor, the Severance Law requires a myriad of ongoing discretionary decisions by "hotel employers," including but not limited to the following:

- Determine who qualifies as a "covered hotel service employee" by, among other things, analyzing whether an employee was laid off a result of a "closure" or "mass layoff," and "performed work in connection with the operation of the hotel";

- Locate eligible workers for whom they may only have contact and payment information updated as of March 1, 2020 (18 months ago);

- Continually monitor employees initially determined to be covered for ongoing eligibility because some may become employed elsewhere or be recalled but decline to return;

- Continually monitor an eligible employee's severance payment each week for potential reduction by the amount of any other severance or "similar pay" provided by the "hotel employer";

- Continually reassess a hotel's status as "closed permanently" and/or "converted or . . . in the process of converting to an alternate use";

- Continually assess whether it has reached and remains at the 25% recall threshold needed to cease making the severance payments, a task made exceptionally complicated because the Law is unclear as to how frequently this assessment would need to be made (daily, weekly, monthly, quarterly) and fails to account for variations in employee retention over time (*e.g.*, refusal to return to work, quitting, termination for cause, promotion to an exempt position, etc.);  and

- Analyze all future closures or "mass layoffs" regardless of whether they occur for COVID or non-COVID related reasons, such as fire or flood damage, because the text of the Law is not limited to the COVID-19 pandemic.

65.     With respect to the second factor, the Severance Law by its explicit terms mandates an ongoing commitment by hotels because the severance benefits must be paid for up to 30 weeks. Ex. 1 at § 2(a).  Because the "hotel employers shall provide the severance pay . . . within five days

after the end of *each* week" a reasonable employee would perceive an ongoing commitment by hotels to provide the benefit. *Id.*, § 2(c) (emphasis added).

66.     With respect to the third factor, the Severance Law requires hotels to analyze the circumstances of each potential employee's termination separately in light of specific criteria. Here, the criteria are that the employee must have been: (a) employed by a "hotel" on March 1, 2020; (b) for at least one year prior performing "hotel service"; (c) was "not a managerial, supervisory or confidential employee"; (d) was laid off after March 1, 2020 due to a "closure or mass layoff"; (e) has not been recalled; and (f) whether 25% of the employees have been recalled.

67.     The numerous ongoing discretionary decisions will require New York City hotels to establish complex and financially burdensome administrative programs to coordinate and control the severance payments. All just to comply with this one Severance Law imposed by the City. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 321 (2016) (requiring "administrators to master the relevant laws of 50 States and to contend with litigation would undermine the congressional goal of minimizing the administrative and financial burdens on plan administrators."). This burdensome ongoing program is in addition to the Fund's health benefits plan which is presently in place and subject to ERISA, and which Plaintiff and other Targeted Hotel Employers have already funded and/or contributed to for covered hotel employees.[25]

68.     Unless the Law is declared unconstitutional and permanently enjoined, Plaintiff will suffer irreparable harm in the form for excessive monetary payments that threaten its solvency.

**B.     The NLRA Preempts the Severance Law.**

    *i.     Machinists* preemption

---

[25] *See NY Hotel Trades Council Treat Their Own*, The New York Hotel Trades Council Employee Benefit Fund https://www.hotelfunds.org/ny-hotel-trades-council-treat-their-own/ (last visited Oct. 19, 2021).

69.     The NLRA, as amended, 29 U.S.C. § 151, *et seq.*, creates a uniform federal body of law governing union organizing, collective bargaining, and labor-management relations applicable to employers engaged in interstate commerce. It established various rules concerning collective bargaining and defined a series of banned unfair labor practices, including bans on interference with the formation or organization of labor unions by employers. The NLRA does not apply to certain workers, including supervisors and managerial employees—categories specifically excluded from the Severance Law.

70.     Based on the doctrine of field preemption, the NLRA implicitly preempts state and local laws that conflict with federal labor law or interfere with the achievement of the federal labor objectives. *See Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Rels. Comm'n*, 427 U.S. 132, 140 (1976); *see also San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246 (1959). *Machinists* preemption "forbids states and localities from intruding upon the labor-management bargaining process" because conduct not specified or prohibited by Sections 7 and 8 of the NLRA, are left "to be controlled by the free play of economic forces." *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 84 (2d Cir. 2015); 29 U.S.C. §§ 157-58. "The framework established in the NLRA was merely a means to allow the parties to reach . . . agreement fairly." *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 81 (2d Cir. 2018).

71.     By enacting the Law, the City intruded upon Congress' objectives and interfered with the free play of economic forces regarding severance pay for Union members.

72.     Passage of the Severance Law was prompted by the Union as evidenced by the following:

- Upon information and belief, the Union drafted the Law.  The original version of Int. No. 2397-A that was introduced by Defendant Moya on September 15, defined a covered hotel service employee as a person who "has a legal right to be recalled to their previous position" (*i.e.*, was a Union member and/or subject to the IWA). **Exhibit 7,** Draft 2397-A.

- Defendant Mayor acknowledged the Union's role in the bill's passage of the Law when he stated, "[Union President Mr. Maroko] told me just how tough it was for [Union] members. [He] told me the doubt and the fear that people were living with. But [he] kept fighting every step of the way, looking for what could be done even in the midst of the greatest crisis we've ever faced. I want to thank [Mr. Maroko] for standing firm."[26]

- When Defendant Mayor signed the bill into law, the ceremony had all the appearances of a Union rally. Workers wearing navy blue Union T-shirts and holding Union signs lined the staircase and walls of the Rotunda; a Union member spoke about how the Severance Law led to her being recalled; Defendant Moya led a chant with the Union members and gave a glowing introduction to Mr. Maroko, who spoke as if he sponsored the Law himself; and Defendant Mayor offered the pens used to sign the Law to all of the Union members surrounding him.[27]

73.     By directly lobbying the City Council for this severance pay, the Union unfairly obtained terms and conditions that they did not and could not obtain under the IWA or the collective bargaining process.  But that is exactly what the NLRA requires them to do—bargain with employers for benefits, not make an end-run around their agreements by lobbying legislative bodies for special treatment. In sum, the Union campaign and the complicit City Council and Mayor have substituted the free-play of political forces for the free-play of economic forces. *See Chamber of Commerce v. Bragdon*, 64 F.3d 497, 504 (9th Cir. 1995).

74.     The Supreme Court has held that a state or local statute is not preempted by the NLRA where it merely establishes a "minimum labor standard" that does not impermissibly intrude upon the collective-bargaining process. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 755 (1985). Such laws can impose "minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA." *Id.* at 754-55. "Minimum

---

[26] TRANSCRIPT: MAYOR DE BLASIO SIGNS LEGISLATION TO REQUIRE SEVERANCE PAY FOR HOTEL SERVICE EMPLOYEES, NYC at 1:31-34 https://www1.nyc.gov/office-of-the-mayor/news/674-21/transcript-mayor-de-blasio-signs-legislation-require-severance-pay-hotel-service-employees (published Oct. 5, 2021).

[27] NYC Mayor's Office, *Mayor de Blasio Signs Bill Requiring Severance Pay for Hotel Service Employees*, YOUTUBE https://www.youtube.com/watch?v=JOjqCyYpP_E.

state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. Nor do they have any but the most indirect effect on the right of self-organization established in the Act." *Id.* at 755.

75.     To be a permissible "minimum labor standard" a law must: (i) be sufficiently broad and generalized such that it is a law of general application; (ii) apply equally to union and non-union employees; and (iii) is truly a "minimum" labor standard which imposes only "minimal" substantive requirements that do not impermissibly interfere with the bargaining process. *See generally 520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119 (7th Cir. 2008).

76.     The Severance Law is not a permissible "minimum labor standard" for several reasons.  First, it is not a law of general application. Rather, it has an impermissibly narrow scope of application that disincentivizes the collective-bargaining process. A lack of general application is significant. *Id.* at 1132.  By its terms, the Severance Law provides that the severance payments are mandated for only one industry (the hotel industry), and to only a subset of employers within that industry (transient hotels that had 100 or more rooms as of March 1, 2020 that did not recall 25% of its employees by October 11, 2021), and only a vaguely defined subset of each covered hotel's employees (non-managerial, -supervisory or -confidential employees, or who did not otherwise exercise control of management of the hotel, and who were employed for at least one year as of March 1, 2020, to perform work "in connection with" the operation of the hotel). Overall, the Severance Law's narrow scope of application demonstrates that it is much more invasive than a permissible law of general application or minimum labor standard. *Id.* at 1130-32.

77.     Second, the Severance Law is not a permissible "minimum labor standard" because it *de facto* treats union and non-union employees differently.  *Id.* at 1133. Although the adopted version of the Law was revised to remove the right to be recalled from the definition of a "covered

hotel service employee," and thereby seemingly seeking to apply to union and nonunion employees alike, the Law still provides benefits or protections to union employees that do not equally apply to nonunion employees.

78.     For example, the Law protects union employees by providing that, "[t]he provisions of severance pay pursuant to this section shall not affect the right, if any, of a covered hotel service employee *to be recalled* to their previous position." Ex. 1 at § 2(d) (emphasis added). There is no similar provision protecting nonunion employees, whose employment status can be converted from "laid off" to "terminated" at any time, and who have no such "recall rights."[28]

79.     Further, the Law provides that the severance payments are *in addition to* any severance or "similar pay" already paid to such employees prior to October 11, 2021. Ex. 1 at § 2(b). Union employees at the Roosevelt and those at the many other hotels governed by the IWA have already received severance payments for the exact purpose provided for in the Law (*i.e.*, the closure of a hotel). Ex. 2 at Art. 52. On the other hand, nonunion employees did not receive the severance pay provided for under the IWA.

80.     Similarly, the IWA provides for enhanced severance pay if a hotel is converted— the exact same purpose for which employees will receive severance payments under Section 3(a) of the Law. Ex. 2 at Art. 57. Again, nonunion employees will not receive this enhanced severance under the IWA.

81.     In sum, the Severance Law's narrow application equates more to a benefit for a bargaining unit than protecting all individuals equally, especially here where the Union is the collective bargaining representative for employees at more than 300 hotels and other related businesses, accounting for approximately 75% of the hotel industry within the five boroughs of

---

[28]     Recall rights are provided for by Article 23 of the IWA.  *See* Ex. 2 at Art. 23.

New York City.[29]  As a result, the Law "targets particular workers in a particular industry and [was] developed and revised from the bargaining of others, [and] affects the bargaining process in a way that is incompatible with the general goals of the NLRA." *520 S. Michigan Ave. Assocs., Ltd*, 549 F.3d at 1133. Thus, the Severance Law is preempted by the *Machinists* doctrine. *Id.*

82.     Third, the Severance Law is not a true "minimum labor standard" because the parties are "not free to devise their own arrangement" and the requirements it imposes on Targeted Hotel Employers are far beyond "minimal." *Id.* at 1134. "Minimum,'" as used by the Supreme Court, implies a low threshold." *Id.*; *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. at 754; *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987). A "minimum labor standard" must only act as a "backdrop" to labor negotiations. *Fort Halifax*, 482 U.S. at 21. A law that imposes requirements that would be very difficult for any union to bargain for are not considered "minimal." *See 520 S. Michigan*, 549 F.3d at 1134. As mentioned above, the severance payments required under the Law must be paid regardless of any agreement governing the terms of severance payments. Thus, unlike a permissible "minimum labor standard," which acts as a "backdrop" for negotiations, the Severance Law substantially and unmistakably amends the specific terms of the in-force IWA.

83.     Further, the Severance Law oppressively burdens hotel employers and owners with the exorbitant cost of making the severance payments. The Law's severance payment terms would clearly be difficult for any union to bargain for, as evidence by the terms of the IWA that the Union actually was able to bargain for. Plaintiff estimates that it will need to fund at least $8.6 million to comply with the Law's $500 weekly severance payments.  If at any point while making those

---

[29]     *See Who We Are,* NY/NJ HOTEL & GAMING WORKERS UNION, https://hotelworkers.org/about/who-we-are (last viewed Oct. 19, 2021).

payments the Roosevelt decides to convert, or "initiates the process of conversion" (whatever that means), it may be forced to pay out an *additional* tens of millions of dollars for the 20 paid days off per year of service owed to its approximately 478 potential employees who worked there as of March 1, 2020.  The Law is silent as to whether a "hotel employer" would be entitled to a credit for severance paid prior to initiating a conversion process, which is yet another vague aspect of the legislation.  The Law is similarly silent as to whether these payments are *in addition to* the enhanced severance provided to Union members under Article 57 of the IWA due to the conversion of a hotel.

84.     The remedies provided under the Severance Law also demonstrate that its requirements are not actually "minimal." The Law grants substantive remedies that would normally have to be bargained for and which would be very difficult for any union to obtain through bargaining.  For example, employees can challenge any non-payment of severance pay required under the Law by filing a civil action in New York State Supreme Court. Ex. 1 at § 4(a). This demonstrates that the Law intrudes the bargaining process in a much more invasive and detailed fashion than a permissible minimum labor standard because it is in direct conflict with Article 26 of the IWA, which requires complaints and disputes related to terms covered under the IWA or the conduct of the parties to be arbitrated before the OIC.[30] *See 520 S. Michigan*, 549 F.3d at 1139.

85.     Additionally, the Severance Law requires that if a court finds that the employee has

---

[30]     Pursuant to IWA Articles 52 and 26, complaints and disputes arising from acts and conduct related to the payment of severance must be arbitrated before the OIC.  Ex. 2 at Arts. 26, 52. By creating a private cause of action for employees, which encourages litigation, the Severance Law also goes against one of the  NLRA's stated purposes of "encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions...." *520 S. Michigan*, 549 F.3d 1119 (state and local laws are preempted where they are incompatible with the goals of the NRLA).

not received severance pay pursuant to the Law, the court *shall* award to the employee *twice the amount* of severance pay otherwise due to the employee under the Law. Ex. 1 at § 4(b). The court *shall* also award to the employee such employee's reasonable attorney's fees and costs. *Id.* This is directly contrary to the express terms of the IWA, which does not permit double damages, and which requires the Union to bear its own costs of representing employees. Ex. 2 at Art. 26 (I). The allowance of such remedies demonstrates that the Law is preempted by *Machinists* because it is incompatible with the goals of the NLRA as it "affects the bargaining process in a much more invasive and detailed fashion than" a permissible minimum labor standard. *See 520 S. Michigan*, 549 F.3d at 1137. One of the NLRA's purposes is "encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions...." *Id.* The Severance Law contravenes this purpose because it encourages litigation rather than the dispute resolution mechanism established by the IWA. *Id.*

> ii.    *Garmon* preemption

86.    The NLRA also preempts state regulation that purports to regulate activities "protected by [section] 7 of the [NLRA], or constitute an unfair labor practice under [section] 8" or "arguably subject to [sections] 7 or 8 of the Act." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. at 246 (discussing "*Garmon*" preemption). "The *Garmon* rule is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 613 (1986).

87.    The NLRA requires employers and unions to bargain over represented workers' terms and conditions of employment, and this "duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract" except after following specific timing and notice requirements and bargaining in good faith until the parties are at an impasse. 29

U.S.C. §§ 158(a)(5), (b)(3), (d). An employer's unilateral changes to terms and conditions of employment violates these obligations. 29 U.S.C. § 158(a)(5); *NLRB v. Katz*, 369 U.S. 736 (1962).

88.     The Severance Law triggers *Garmon* preemption because compliance with the Law will require Plaintiff and other Targeted Hotel Employers with employees covered by the IWA to violate the NLRA by unilaterally imposing modifications to the IWA without engaging in collective bargaining.  First, Article 52 of the IWA imposes bargained-for severance obligations on hotel employers bound by the IWA resulting from a hotel closure. Ex. 2 at Art. 52. Also, Article 57 requires enhanced severance payments for employees laid off where a hotel is converted to residential use (e.g., a condominium or co-operative use of the building, apartment rental units, etc.). *Id.* at Art. 57.

89.     The severance payments required under the Law conflict with IWA Articles 52 and 57 and thus require Plaintiff and other Targeted Hotel Employers to unilaterally modify the contractual obligations therein in violation of Section 8 of the NLRA. 29 U.S.C. § 158.  In other words, Targeted Hotel Employers are left with two options: (1) comply with the Severance Law and violate Section 8 of the NLRA; or (2) comply with Section 8 of the NLRA and risk litigation for violation of the Severance Law.

90.     "Notably, for preemption purposes a court need not decide whether the conduct alleged would be deemed to be prohibited by the NLRA, since it is enough that the conduct upon which the state causes of action are based is 'arguably' prohibited." *Pa. Nurses Ass'n v. Pa. State Educ. Ass'n*, 90 F.3d 797, 802 (3d Cir. 1996); *see Aeroground, Inc. v. City & County of S.F.*, 170 F. Supp. 2d 950, 956 (N.D. Cal. 2001) (granting a preliminary injunction against a city rule where the rule "requir[es] conduct that conflicts with certain options for employers that are protected by the NLRA. By pointing out these conflicts, the court concludes that [plaintiff] has demonstrated

that a significant probability exists that the rule is preempted under the *Garmon* doctrine"). Thus, the court need not now decide whether the Law's mandate and Targeted Hotel Employers' compliance with such mandate constitutes a unilateral modification prohibited by the NLRA because such conduct is "arguably" (if not explicitly) prohibited by the NLRA. Indeed, the plain language of Section 8 of the NLRA evidences the conflict between the NLRA and the mandatory conduct required under the Law. 29 U.S.C. § 158.

91.     Unless the Law is declared unconstitutional and permanently enjoined, Plaintiff will suffer irreparable harm in the form for excessive monetary payments that threaten its solvency.

**C.     New York State Law preempts the Severance Law.**

92.     Under New York law, the authority of local municipalities such as the City to enact legislation is limited by the State Constitution and the Municipal Home Rule Law. N.Y. MUN. HOME RULE L. § 10. Specifically, the New York State Constitution, N.Y. CONST. art. IX, § 2(c), grants local governments the power to adopt and amend local laws *not inconsistent with* the provisions of the constitution or any general law of the State.

93.     While New York State courts have held that the police power of local municipalities is broad, "local governments may not exercise their police power by adopting a law inconsistent with the Constitution or any general law of the State." *Jancyn Mfg. Corp. v. County of Suffolk*, 518 N.E.2d 903, 905 (N.Y. 1987). "A local law may be ruled invalid as inconsistent with State law not only where an express conflict exists between the State and local laws, but also where the State has clearly evinced a desire to preempt an entire field thereby precluding any further local regulation." *Id.*

94.     Under the doctrine of field preemption, a local law is invalid as inconsistent with State law where the State has evinced a desire to preempt an entire field thereby precluding any

further regulation. *Albany Area Builders Ass'n v. Guilderland*, 546 N.E.2d 920, 920 (N.Y. 1989). "Where the State has preempted the field, a local law regulating the same subject matter is deemed inconsistent with the State's transcendent interest, whether or not the terms of the local law actually conflict with a State-wide statute." *Id.*

      i.     <u>Article 18 of the New York Labor Law</u>

95.     Here, regardless of how Defendants chose to characterize the Law, it is clear that these severance payments are in the nature of unemployment payments. Indeed, the end of federal unemployment benefits was cited by Defendant Member Moya in support of the Law.[31] Councilman Kalman Yeger opposed the bill, remarking: "this is not a severance bill; it is an unemployment bill…[and as such] we are preempted by State labor law."[32]

96.     Article 18 of the New York Labor Law creates a complex scheme of unemployment benefits for its citizens with detailed regulations concerning how the fund is managed. N.Y. Lab. L. §§ 550-51. The unemployment insurance program in New York is robust, and regulates the rate, timing, and method an employer must make contributions. N.Y. Lab. L. § 570. The New York State law also addresses how severance payments figure into the unemployment scheme, as it reduces benefits payments if severance exceeds the maximum weekly benefit rate. *See id.* at §591(6).

97.     Defendants are not authorized to enact local legislation that upset the State's detailed and comprehensive system of unemployment insurance for one specific industry simply

---

[31] TRANSCRIPT: MAYOR DE BLASIO SIGNS LEGISLATION TO REQUIRE SEVERANCE PAY FOR HOTEL SERVICE EMPLOYEES, NYC at 1:31-34 https://www1.nyc.gov/office-of-the-mayor/news/674-21/transcript-mayor-de-blasio-signs-legislation-require-severance-pay-hotel-service-employees (published Oct. 5, 2021).

[32] *File No. 2397-2021 A*, N.Y.C. COUNCIL, LEGISLATIVE RESEARCH CENTER https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5129961&GUID=24043573-28E5-4F9E-BA70-F4AA45A30487&Options=&Search= (last visited Oct. 19, 2021).

because of organized labor's successful lobbying campaign.

    *ii.*    *Article 20 of the New York Labor Law*

98.    The Severance Law is also preempted by Article 20 of the New York Labor Law (the "New York State Labor Relations Act"). The New York State Labor Relations Act creates a robust and complex scheme "encourage[ing] the practice and procedure of collective bargaining, and to protect employees in the exercise of full freedom of association, self-organization and designation of representatives of their own choosing for the purposes of collective bargaining, or other mutual aid and protection, free from the interference, restraint or coercion of their employers." N.Y. Lab. L. § 700. The New York State Labor Relations Act also declared the public policy of the state to ensure "that the voluntary resolution of such [labor] disputes [in order] to promote permanent industrial peace and the health, welfare, comfort and safety of the people of the state." *Id.*

99.    The Severance law is preempted by the New York State Labor Relations Act because the Act clearly intended to occupy the field of labor relations, in all respects that the NLRA does not. Defendants are not authorized to enact local legislation that upset the State's detailed and comprehensive system of labor relations.

100.    Unless the Law is declared unconstitutional and permanently enjoined, Plaintiff will suffer irreparable harm in the form of excessive monetary payments that threaten its solvency.

**D.**    **The Severance Law Violates the Contract Clause.**

101.    Article 1, Section 10 of the United States Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. CONST., art. I, § 10, cl. 1. When deciding whether a law violates the Contract Clause, courts in this Circuit ask: "(1) [whether] the contractual impairment [is] substantial and, if so, (2) [whether] the law serve[s] a

legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) [whether] the means chosen to accomplish this purpose [are] reasonable and necessary." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997).

102.   The IWA is a valid contract between the Union, which represents employees at the Roosevelt, and HANYC. The IWA applies to Plaintiff through Plaintiff's ownership of the Roosevelt and its funding obligations for the operation of the Roosevelt, including obligations that arise under the IWA.

103.   The substantiality of a contractual impairment depends upon "the extent to which reasonable expectations under the contract have been disrupted." *Id.* at 993.

104.   The Severance Law not only substantially, but severely, impairs the IWA for several reasons. First, the Severance Law impairs IWA Article 52's provision regarding the amount and duration of severance pay. The impairment is substantial and severe because Plaintiff estimates that providing $500 weekly payments to potentially 478 employees for up to 30 weeks could cost it an additional $8.6 million (which is in addition to the more than $15.4 million it has already funded towards payments under the IWA, *see supra*, ¶ 11). Plaintiff reasonably expected that when it had satisfied its funding obligations for payments due under the IWA, it would not be required to provide additional funds to pay more severance due to Union members—as well as what is essentially unemployment benefits to non-Union employees. The Severance Law has created numerous unforeseen contingencies and financial burdens that jeopardize Plaintiff's solvency, and likely that of many other hotels.

105.   Second, the Severance Law substantially and severely impairs IWA Article 26 by granting employees a private cause of action with double damages and attorney's fees.  Under the

express terms of Article 26, labor disputes are to be arbitrated before the OIC—not litigated in New York State Supreme Court. The lengthy history of the Union and unionized hotels submitting to arbitration and adhering to arbitration awards (including the two discussed above in Section IV.B) demonstrates that Plaintiff and other hotels would not reasonably expect the City to create a private cause of action for the Union's nearly 33,000 hotel workers.  This severely impairs the Plaintiff's and other hotel owners', employers', managers', and operators' reliance on the IWA.

106.    Third the Severance Law substantially and severely impairs the IWA because its passage was not reasonably foreseeable. The lack of foreseeability is demonstrated by the unprecedented nature of this legislation—a municipality is attempting to require certain-sized private hotels to pay their employees (who were laid off over 18 months ago), unemployment benefits over the next six months.  This is far from typical or reasonably expected legislation passed at the municipality level, nor has the New York City Council legislated in this area in the past.  Employee unemployment relief generally comes from government funds, not mandated to be paid by private employers.

107.    The retroactive nature of Section 3 makes the Severance Law even less foreseeable. Instances where state laws require employers to offer terminated employees severance pay are never directed at only one industry and when enacted, they are forward looking. Meaning when they were passed, they apply to facilities that close in the future.  Here, the Law applies to layoffs and closures that happened over 18 months ago.

108.    The Severance Law does not advance a legitimate public purpose.  The Law is targeted at aiding only *certain hotel employees* who were laid off as of March 1, 2020, and had been employed for a year or more as of that time.  As such, it impermissibly protects "a narrow class" or "favored group" of employees and is not a law enacted to protect a broad societal interest.

*E.g.*, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249-50 (1978) (under the contract clause, struck down Minnesota Private Pension Benefits Protection Act, which superimposed retroactive pension obligations on a company, in part because "[t]he law was not even purportedly enacted to deal with a broad, generalized economic or social problem.").

109.    The Severance Law is not a reasonable or necessary means of advancing the Law's stated purposes. "In considering a law's necessity, courts have looked to whether the law in question seeks to address a *real emergency*." *Melendez v. City of New York*, 503 F. Supp. 3d 13, 34 (S.D.N.Y. 2020) (emphasis added).  Here, New York State's state of emergency ended on June 24, 2021.

110.    To the extent that the economy in New York State continues to suffer effects of or from the pandemic, all service industry workers—including restaurant/bar, retail, and beauty salon workers—are suffering, not just hotel workers.  In other words, if the end of federal and state unemployment benefits is such an emergency, then it's an emergency for all service industry workers, not just hotel workers.  In this way, the Law is under-inclusive.  It is a targeted benefit resulting from one special interest's lobbying campaign.

111.    The Severance Law is also not reasonable or appropriately tailored because it is not conditioned on need.  See *Melendez v. City of New York*, No. 20-4238-CV, 2021 WL 4997666, at *39 (2d Cir. Oct. 28, 2021) (discussing how Guaranty Law's lack of being conditioned on need weighs against reasonableness).  In other words, the Law does not account for whether employees have found other sources of income (*e.g.*, obtained other employment, became eligible for social security and/or retirement benefits, etc.).  Instead, the Law imposes a flat $500 weekly severance payment for up to 30 weeks for all hotel service employees, without any showing of need by an employee and without regard to quality or length of service for each employee.  As to time, the

Law's grant of 30 weeks of severance pay is far too long considering that New York State's unemployment benefits originally only allow for 26 weeks of pay.  Additionally, the amount of $500 is too much when employees were only receiving $300 per week as federal benefits ended in September.

112.    Although the Law purports to be temporary by expiring on June 1, 2022, such a temporal limit does not make the Law temporary. Once the monetary severance payment is made to a covered employee, the hotel's right to that money has been permanently and entirely lost. Other laws that have been upheld under a Contract Clause challenge as temporary involved a suspension of a right (*e.g.*, suspension of right to foreclose for period of time).  Here, the Severance Law isn't a temporary suspension of one's rights, but rather a permanent transfer of funds.

113.    The Law is also not a reasonable or necessary means of advancing the City's stated public purposes because the Law's fails to provide hotel owners and operators any compensation for damages or losses sustained as a result of the impairments on the IWA.  *See Melendez*, No. 20-4238-CV, 2021 WL 4997666, at *41 (2d Cir. Oct. 28, 2021) (questioning the reasonableness of New York City's Guaranty Law as a means to serve the City's stated public purpose to help communities because of the Guaranty Law's failure to provide for landlords or their principals to be compensated for damages or losses sustained as a result of their guaranties' impairment).  Here the law permanently deprives hotel owners of their funds without regard for the hotel workers actual need, and the failure to condition such relief on some compensation for or mitigation of, taxes (such as payroll or land) and/or other obligations that the hotel owners and operators are required to satisfy, violates the Contract Clause.

114.    Unless the Law is declared unconstitutional and permanently enjoined, Plaintiff will suffer irreparable harm in the form of the depravation of their constitutional rights under the

contract clause.

**A.       The Severance Law Violates the Due Process Clause.**

115.    The Law is violative of the Due Process Clause of the Fourteenth Amendment as a result of its vague nature, *supra* ¶¶ 48-58.  The Law fails to provide reasonable notice as to what is and what is not required or permitted and fails to provide clear and explicit standards to Plaintiff and other hotel owners, employers, managers, or operators in New York City.  *See*, *e.g.*, *Genco Importing, Inc. v City of New York*, 552 F. Supp. 2d 371, 383-84 (S.D.N.Y 2008); *Melendez v. City of New York*, 503 F. Supp. 3d 13, 30-32 (S.D.N.Y. 2020).

116.    On its face and as applied to Plaintiff, the Law is vague and does not provide Plaintiff with adequate or reasonable notice about who is eligible to receive the severance payments (because, *inter alia*, the Law does not define or explain the meaning of a "confidential employee") or how much each eligible employee is entitled to receive (because, *inter alia*, the Law permits deductions for other severance or "similar pay" received by an employee, but fails to articulate what "similar pay" might mean).   Moreover, by requiring Targeted Hotel Employers to engage in decision-making without clear guidance, the Severance Law facilitates and even invites arbitrary or discriminatory conduct as to who receives severance payments, and how much each person receives.

117.    In addition, the enactment and enforcement of the Law violates the Due Process Clause of the Fourteenth Amendment because the Law represents an "arbitrary, conscience-shocking, or oppressive" act against Plaintiff's property interests.  *See Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir. 2006).

118.    There is no question that Plaintiff has a substantial property interest at stake.  If the Law is not enjoined, Plaintiff estimates that it will be required to fund millions of dollars in

severance payments to laid-off employees—which is in addition to the more than $15.4 million it has already funded to Interstate to be paid out pursuant to the IWA.

119.     Moreover, the Law is arbitrary and not rationally related to a legitimate public purpose in the City.  As alleged above, the legislative history reflects two stated purposes for the Law: (a) to provide a social safety net for laid-off hotel employees; and (b) to encourage and incentivize hotels to re-open to the public.

       *i.*    *Providing a social safety net for laid-off employees*

120.     The Severance Law is an arbitrary and capricious extraction of resources from Plaintiff and other New York City hotel owners, employers, managers, or operators for the benefit of the Union's members.  The Law is not a rational means for pursuing a social safety net for laid-off employees, for at least five reasons. First and foremost, as written, the Law requires Plaintiff and other hotel owners, employers, managers, or operators to fund and/or pay $500 each week to a covered employee *even if that employee has found employment elsewhere*.  The only deductions from the weekly payments are for other severance or "similar pay" from the same "hotel employer."  The core function of providing a social safety net, or unemployment benefits, is to address a need—the need for persons to be able to survive while they are out of work.  But the Severance Law arbitrarily requires payments be made regardless of need or current employment status.

121.     Second, the Law is arbitrary and capricious by imposing a flat $500 weekly payment requirement for each laid-off employee, regardless of the employee's length of service, or the employee's wages at the time of being laid off, or the quality of the employee's services during employment.  Indeed, the Law purports to cover part-time and minimum-wage employees who may have *earned less than $500 each week* while employed at the Roosevelt.  Moreover, the Law permits up to 30 weeks of severance pay for an employee who may have only worked for one

41

year (52 weeks)—this is the epitome of arbitrary, capricious, and oppressive action by Defendants.

122.    Third, the Law targets only hotels with more than 100 rooms.  If the purpose of the Law is to provide a social safety net for laid-off hotel employees, there is no rational basis for limiting its application to only large hotels.

123.    Fourth, a hotel need not pay severance under the Law if, by November 1, 2021, they had "recalled 25 percent or more of its employees [*i.e.*, recalled Union members] employed as of March 1, 2020 and reopened to the public."  This is an irrational and arbitrary method for pursuing a social safety net of unemployment benefits for laid-off employees.  A hotel that has re-opened to the public with 26% of its workforce need not pay any benefits to any employees pursuant to the Law, but a hotel that has re-opened with 24% of its workforce may be subject to millions of dollars of liabilities under the Law.  Relatedly, under Section 3.b. of the Law, a laid-off employee would lose his or her severance payments even if not brought back to work, because a hotel that re-opens to the public and brings back 25% or more of its laid-off employees has no obligations under the Law.  Thus, under the Law, bringing back 25% of employees eliminates benefits for the 75% *not* brought back.  This is not a rational system of providing unemployment benefits.

124.    Fifth, the capricious nature of the Law is highlighted by the remedies made available to an employee.  An employee can sue in court and, if successful, "shall" be awarded double damages as well as attorneys' fees.  In other words, the Severance Law has been drafted as a weapon to be wielded against New York City's struggling hotel industry—untethered to the needs of an employee.  Mandating double damages is not a rational means of ensuring that employees received unemployment benefits necessary to meet their needs.  It is a means of punishment.

125.    Moreover, Defendants have imposed the burdens of the Law on Plaintiff and other hotel owners, employers, managers, or operators without even considering the financial ramifications of their legislation.  In fact, they enacted the Law while recognizing that the hotel industry is in "dire straits." *Supra*, ¶ 44.

ii.    *Incentivizing hotels to re-open to the public*

126.    The Severance Law does not rationally seek to incentivize hotels to re-open.  It provides no incentives at all, only the threat of millions of dollars of additional severance payments, litigations expenses, and double damages. Additionally, to the extent the Severance Law is intended to force hotels to re-open to the public, as Member Moya and the Mayor has publicly suggested,[33] there is no legitimate public purpose at all. Forcing businesses to reopen and operate, despite having significant negative consequences on the finances of the business, is not a legitimate governmental interest.  It is only in the interest of a special interest, the Union.

127.    Section 3 of the Law has no relation whatsoever to encouraging a hotel to re-open, because it relates only to hotels that have "closed permanently" and are converting or have converted to some other use.  The benefits provided under Section 3 simply punish a hotel that has made the financial decision to forever close.

128.    Additionally, although a hotel that re-opens to the public need not pay severance under the Law, there is nothing in the Law defining what constitutes re-opening to the public.  The Law provides that only 25% of a hotel's employees must be recalled, which suggests that re-

---

[33]    *Sept. 15, 2021 Hearing on Introduction 2397 Before the Comm. on Consumer Affs. and Bus. Licensing*, N.Y.C. Council at 15:16-16:4, 16:10-17, https://legistar.council.nyc.gov/View.ashx?M=F&ID=9856860&GUID=43785DE8-1AA3-460A-8070-9FF49802AC68; *see also* TRANSCRIPT: MAYOR DE BLASIO SIGNS LEGISLATION TO REQUIRE SEVERANCE PAY FOR HOTEL SERVICE EMPLOYEES, NYC https://www1.nyc.gov/office-of-the-mayor/news/674-21/transcript-mayor-de-blasio-signs-legislation-require-severance-pay-hotel-service-employees (published Oct. 5, 2021).

opening does not mean fully re-opening to full pre-pandemic levels.  In other words, at most, the Law encourages a hotel to recall a fraction of its Unionized employees and to re-open at a fraction of its 2019 operational capacity.

129.    Finally, it is not a legitimate governmental interest to force the re-opening of private businesses by threatening those businesses with the extraction of millions of dollars of "severance" payments.  In our capitalistic economy, market forces dictate when and where a business opens, closes, or re-opens.  Rational hotel owners, like Plaintiff, will re-open if the financial outlook for their business is promising.  They will not re-open if the outlook is gloomy.  Government may provide carrots—true incentives, such as tax benefits—for businesses to open if in the public interest to do so, but the government acts in an inherently oppressive manner when it forces a business to choose between (a) paying crushing "severance" payments while closed and not generating any income, or (b) re-opening in a depressed market that will result in the operational loss of millions of dollars.  This is the choice the Law is seeking to impose on Plaintiff and other hotel owners, employers, managers, or operators.

130.    Unless the Law is declared unconstitutional and permanently enjoined, Plaintiff will suffer irreparable harm in the form of the depravation of their constitutional right to due process.

**B.    The Severance Law Violates the Equal Protection Clause.**

131.    The Equal Protection Clause of the United States Constitution states, "no State shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

132.     Plaintiff is a "class-of-one plaintiff." *See Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013). ("Where, as here, a plaintiff does not claim to be a member of a constitutionally protected class, he may bring an Equal Protection claim pursuant to one of two theories: (1) selective enforcement, or (2) 'class of one.'").  Plaintiff was "intentionally treated differently from others similarly situated and 'there is no rational basis for the difference in treatment.'" *AYDM Assocs., LLC v. Town of Pamelia*, 205 F. Supp. 3d 252, 268 (N.D.N.Y. 2016) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

133.     In *Neilson v. D'Angelis*, 409 F.3d 100 (2d Cir. 2005), the Second Circuit held that a class-of-one plaintiff can establish that it and the comparator are "prima facie identical" for Equal Protection purposes by showing that:

(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of mistake. *Id.* at 105.

134.     Plaintiff easily satisfies the *Neilson* test. As alleged herein, the COVID-19 pandemic has devastated the tourism industry in New York City. However, this industry was not the only one which suffered. Across New York City, dining, arts and entertainment, construction, etc. all suffered during the pandemic. Another hard-hit industry was the airline industry – another industry which Plaintiff's affiliated company and one of the primary sources of Plaintiff's cash flow during times of cash shortages, PIA Investments Limited, operates in. All (or nearly all) of these industries had to lay off employees because of the pandemic. There is no rational basis for Defendants to single out and discriminate against hotel owners and operators by imposing millions

of dollars of "severance" payments on them and not imposing similar requirements on other similarly situated businesses.

135.    In addition to the City's disparate treatment of hotels vis-à-vis other industries, the Severance Law irrationally targets only a small subset of hotels, those "transient" hotels with more than 100 rooms that do not recall at least 25% of their employees by October 11, 2021. Put simply, there is no rational basis for treating a hotel with 100 rooms any differently than one with 99 rooms, or for treating a hotel that recalls 25% of its employees any differently than a hotel that recalls 24% of its employees, yet the City has done just that.

136.    The COVID-19 pandemic does not give government the right to trample the Equal Protection Clause. See *Dimartile v. Cuomo*, 478 F. Supp. 3d 372 (N.D.N.Y. 2020) (finding no rational basis for a 50-person gathering restriction on weddings, where indoor dining was not subject to the same restriction), *vacated as moot*, 834 Fed. Appx. 677 (2d Cir. 2021). Similarly, there is no rational basis for the Law's discrimination against New York City hotels that had more than 100 rooms in March 2020.  The only basis for targeting such a select group of businesses with harsh economic burdens is to appease the wishes of a special interest, here, the Union.

137.    Unless the Law is declared unconstitutional and permanently enjoined, Plaintiff will suffer irreparable harm in the form of the depravation of their constitutional right to equal protection.

### VI.    <u>COUNT ONE</u>
**ERISA Preemption**
**(City and Mayor)**

138.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

139.    The Severance Law is expressly preempted by ERISA.  *Supra*, ¶¶ 59-68.

## VII.   COUNT TWO
### NLRA Preemption
### (City and Mayor)

140.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 139 of this Complaint, as if fully set forth below.

141.   At all relevant times, Plaintiff was engaged in interstate commerce.

142.   The NLRA preempts the Severance Law under *Machinists*. *Supra*, ¶¶ 69-85.

143.   The NLRA also preempts Severance Law under *Garmon*. *Supra*, ¶¶ 86-91.

## VIII.   COUNT THREE
### New York State Unemployment Benefits Preemption
### (City and Mayor)

144.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 143 of this Complaint, as if fully set forth below.

145.   New York State law has established a comprehensive and detailed scheme for regulating unemployment benefits.  N.Y. Lab. L. §§ 550-51.  The City lacks authority to legislate in the field of unemployment benefits, and, therefore, the Severance Law is unconstitutional under New York law. *Supra*, ¶¶ 95-97.

## IX.   COUNT FOUR
### New York State Employment Relations Act Preemption
### (City and Mayor)

146.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 145 of this Complaint, as if fully set forth below.

147.   New York State law has established a comprehensive and detailed scheme for regulating labor relations. N.Y. Lab. L. § 700.  The City lacks authority to legislate in the field of labor relations, and, therefore, the Severance Law is unconstitutional under New York law. *Supra*, ¶¶ 98-100.

47

### X.   COUNT FIVE
**Violation of U.S. Constitution's Contract Clause**
**42 U.S.C. §1983**
**(All Defendants)**

148.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 147 of this Complaint, as if fully set forth below.

149.   At all relevant times, Defendants, their agents and their employees were persons acting under color of State law.

150.   At all relevant times, Plaintiff was a "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit under 42 U.S.C. § 1983.

151.   The Severance Law violates the Contract Clause of Article I, § 10 of the United States Constitution.  *Supra*, ¶¶ 101-114.

152.    Pursuant to 42 U.S.C. § 1983, the Defendants, acting under color of state law, have violated Plaintiff's constitutional rights under the Contract Clause.

153.    Pursuant to 42 U.S.C. § 1983, Plaintiff seeks an award of its costs, including reasonable attorneys' fees, incurred in the litigation of this case.

### XI.   COUNT SIX
**Violation of the U.S. Constitution's Fourteenth Amendment Due Process Clause**
**42 U.S.C. §1983**
**(All Defendants)**

154.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 153 of this Complaint, as if fully set forth below.

155.   At all relevant times, Defendants, their agents and their employees were persons acting under color of State law.

156.   At all relevant times, Plaintiff was a "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit under 42 U.S.C. § 1983.

48

157.    By enacting and seeking to enforce the Law, the Defendants have violated and are violating the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Supra*, ¶¶ 115-130.

158.    Pursuant to 42 U.S.C. § 1983, the Defendants, acting under color of state law, have deprived Plaintiff of due process under the law.

159.    Pursuant to 42 U.S.C. § 1983, Plaintiff seeks an award of its costs, including reasonable attorneys' fees, incurred in the litigation of this case.

**XII.    COUNT SEVEN**
**Violation of the U.S. Constitution's Fourteenth Amendment Equal Protection Clause**
**42 U.S.C. §1983**
**(All Defendants)**

160.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 159 of this Complaint, as if fully set forth below.

161.    At all relevant times, Defendants, their agents, and their employees were persons acting under color of State law.

162.    At all relevant times, Plaintiff was a "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit under 42 U.S.C. § 1983.

163.    By enacting and seeking to enforce the Law, the City has violated and is violating the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *Supra*, ¶¶ 131-137.

164.    Pursuant to 42 U.S.C. § 1983, the Defendants, acting under color of state law, have deprived Plaintiff of equal protection under the law.

165.    Pursuant to 42 U.S.C. § 1983, Plaintiff seeks an award of its costs, including reasonable attorneys' fees, incurred in the litigation of this case.

### XIII.   PRAYER FOR RELIEF

Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 165 of this Complaint, as if fully set forth below.

Plaintiff prays for judgment in its favor and for the following relief:

a.   A Temporary Restraining Order enjoining the enforcement of the Severance Law, because said Law is preempted by federal and state law and violates the United States Constitution in several respects as alleged herein.

b.   Preliminary and final injunctive relief enjoining the enforcement of the Severance Law, because said Law is preempted by federal and state law and violates the United States Constitution in several respects as alleged herein.

c.   A declaratory judgement declaring that the Severance Law: (1) is preempted by ERISA; (2) is preempted by the NLRA; (3) is preempted by New York State law; (4) violates the Contract Clause; (5) violates the Equal Protection Clause of the Fourteenth Amendment; and (6) violates the Due Process Clause of the Fourteenth Amendment.

d.   Granting Plaintiff an award of reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1983.

e.   Granting Plaintiff such other and further relief as deemed just and proper.

Dated: New York, New York
         November 10, 2021

Respectfully submitted,

VENABLE LLP

*/s/ Michael J. Volpe*
Michael J. Volpe (MV 0171)
Sarah A. Fucci
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
T: (212) 808-5676
mjvolpe@venable.com

*Attorneys for Plaintiff RHC Operating, LLC*