UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RHC OPERATING LLC,

                Plaintiff,

        -v-

CITY OF NEW YORK, *et al.*,

                Defendants.

21-CV-9322 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Two years ago, the COVID-19 pandemic shuttered New York City almost overnight. Many hotels closed soon after, and many more laid off their workers. For a year and a half, the federal government provided supplemental unemployment benefits. When those benefits expired, the City of New York enacted a law generally requiring still-closed hotels to pay laid-off workers five hundred dollars in severance pay for thirty weeks, starting on October 11, 2021. Plaintiff owns the Roosevelt Hotel, which closed to the public in December 2020, and has not reopened.

      In this action, Plaintiff challenges the Severance Law, asserting that it is preempted by the Employee Retirement Income Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, and the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. §§ 151, *et seq.* Plaintiff also claims that the law violates the Contracts Clause, Due Process Clause, and Equal Protection Clause. At the outset, Plaintiff moves for a preliminary injunction to enjoin the enforcement of the law. Because Plaintiff has not shown a likelihood of success on the merits of any federal claim, the motion is denied.

I.     **Background**

A.     **Factual and Statutory Background**

The following background is drawn "from the parties' submissions in connection with [the] motion for a preliminary injunction," including the complaint, declarations, and attached exhibits. *LSSi Data Corp. v. Time Warner Cable, Inc.*, 892 F. Supp. 2d 489, 494 n.2 (S.D.N.Y. 2012). By March 2020, COVID-19 had arrived in New York City. (*See* Dkt. No. 1 ("Compl.") ¶ 18.) There was a widespread fear of infection. (*See* Compl. ¶ 19.) That month, the federal government, the State of New York, and the City of New York each declared a state of emergency. (*See* Compl. ¶ 18.) They restricted travel, banned gatherings, and prohibited indoor dining. (*See* Compl. ¶ 18.)

Among everything else, hotels lost revenue. (*See* Compl. ¶ 19.) In New York City, occupancy rates plummeted to 35 percent. (*See id.*) By the end of the year, two hundred of the City's seven hundred hotels had closed (*see* Compl. ¶ 20), including the Roosevelt Hotel, which furloughed most employees in March, laid off the rest in October, and closed in December (*see* Compl. ¶ 21). Although cases of COVID-19 have dropped since, and many restrictions have been lifted, occupancy rates have not returned to pre-pandemic levels. (*See* Compl. ¶¶ 19-23.) At least ninety hotels remain closed due to the pandemic. (*See* 21-CV-8321, Dkt. No. 22 ("Dandapani Declaration") ¶ 6.) Around sixty percent of the City's hotel workers are still unemployed. (*See* Dkt. No. 32-1 ("First Committee Report") at 24.)

At the peak of the pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. *See* 15 U.S.C. §§ 9001, *et seq.* Among other things, the CARES Act extended eligibility for workers to apply for additional weeks of unemployment benefits until September 5, 2021. *See, e.g.*, *id.* § 9021. It also supplemented unemployment

benefits for recipients by six hundred dollars a week from March 2020 until July 31, 2020, and three hundred dollars a week from December 26, 2021 until September 5, 2021.  *See id.* § 9023.

### B.      The Severance Law

New York City's Severance Law, Int. No. 2397-2021, was introduced on September 9, 2021, and signed into law on October 5, 2021.  (*See* Compl. ¶ 26.)  It applies only to hotels that had at least a hundred rooms on March 1, 2020, *see* Severance Law, § 1, and only to hotels that had a "closure" or a "mass layoff" sometime after March 1, 2020, *see id.*  A "closure" generally means "the closure of a hotel to the public."  *Id.*  A "mass layoff" generally means a "reduction in force" of "75 percent or more of the employees engaged in hotel service" during "any 30-day period."  *Id.*

The Severance Law benefits "covered hotel service employee[s]" at such hotels — employees who were "employed by such hotel on March 1, 2020"; had been employed at the time for at least a year "to perform hotel service"; were not at the time "managerial, supervisory or confidential employee[s] and did not otherwise exercise control over the management of such hotel"; and were "laid off after March 1, 2020 due to a closure or a mass layoff."  *Ibid.*

The Severance Law directs "hotel employer[s]" at such hotels to "provide to each covered hotel service employee $500 in severance pay for each week, after [October 11, 2021,] that such employee remains laid off," for up to 30 weeks.  *Id.* § 2(a).  That pay is offset, however, by "any severance or similar pay provided or owed for [those] week[s] to such employee by the hotel employer."  *Id.* § 2(b).  It must be given "within five days after the end of each week."  *Id.* § 2(c).

The Severance Law provides that a covered hotel need not pay such severance once the covered hotel service employee is "recalled."  *Id.* § 3(b).  Further, a hotel that "experienced a closure" need not pay such severance once it "reopens to the public and has recalled 25% or

more of its employees employed as of March 1, 2020." *Id.*  Finally, a hotel that "has closed

permanently and has converted or is in the process of converting to an alternate use" need not

pay such severance so long as "every covered hotel service employee at such hotel is offered

severance pay specifically for such conversion in an amount that equals no less than pay for 20

days per year of service, at the same rate that such employee is paid for paid days off." *Id.*

§ 3(a).

Where a hotel must pay such severance, any "covered hotel service employee who has

not received severance pay . . . may bring an action . . . against a hotel employer" in a New York

State Supreme Court.  *See id.* § 4(a).  If a violation is found, the court "shall award . . . twice the

amount of severance pay owed . . . and such employee's reasonable attorney's fees and costs."

*Id.* § 4(b).

The law expires on June 1, 2022.  *See id.* § 5.

### C.    Procedural History

Plaintiff RHC Operating LLC owns the Roosevelt Hotel.  (*See* Compl. ¶ 10.)  On

November 10, 2021, Plaintiff filed this action against the City of New York, Mayor Bill De

Blasio, and the New York City Council Members who voted for the Severance Law.  (*See*

Compl. at 1.)  The complaint asserts that the Severance Law is preempted by the Employee

Retirement Income Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, (*see* Compl. ¶¶ 59-68,

138-139,) and the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. § 151 *et seq.*, (*see*

Compl. ¶¶ 69-91, 140-143.)  It also asserts that the law violates the Contracts Clause (*see* Compl.

¶¶ 101- 114, 148-153,) the Due Process Clause (*see* Compl. ¶¶ 115-130, 154-159,) and the Equal

Protection Clause of the United States Constitution, (*see* Compl. ¶¶ 131-137, 160-165.)  Finally,

Plaintiff asserts that the Severance Law is preempted under state law by New York's

comprehensive schemes for regulating unemployment benefits, *see* N.Y.L.L. §§ 550-51; and labor relations, *see* N.Y.L.L. § 700.  (*See* Compl. ¶¶ 92-100, 144-147.)

Plaintiff moves for a preliminary injunction to "stop Defendants from enforcing" the Severance Law.  (Dkt. No. 19 ("Application for Preliminary Injunction") at 1.)  The motion primarily relies on "the allegations made in the Complaint," which includes legal argument (*id.* at 4; *see, e.g.*, Compl. ¶¶ 59-68), and a brief supplemental memorandum of law (*see* Dkt. No. 30.)

The Hotel Association of New York City ("HANYC"), which has filed a parallel lawsuit, has also filed a memorandum in support of the motion for preliminary injunction as an interested party.  (*See* 21-CV-8321, Dkt. No. 23.)

## II.     Legal Standard

Federal Rule of Civil Procedure 65 authorizes a court to issue a preliminary injunction. Such injunctions are "never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Rather, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *New York by James v. Griepp*, 11 F.4th 174, 177 (2d Cir. 2021) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948 (3d ed. 2021)).  Where, as here, "a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction."  *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (quoting *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020)).

### III.   Discussion

The Court considers the merits of each of Plaintiff's federal claims, ultimately concluding

that it has not shown a likelihood of success on any federal claim.

### A.   ERISA Preemption

ERISA mandates that employers use "certain oversight systems and other standard

procedures" to make "benefits promised by an employer more secure." *Rutledge v. Pharm. Care*

*Mgmt. Ass'n*, 141 S. Ct. 474, 480 (2020).  To that end, ERISA aims to have employers "establish

a uniform administrative scheme [to] provide[] a set of standard procedures to guide processing

of claims and disbursement of benefits." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987).

Accordingly, ERISA "ensure[s] that plans and plan sponsors [are] subject to a uniform body of

benefits law." *Rutledge*, 141 S. Ct. at 480.  The Act "supersede[s] any and all State laws insofar

as they . . . relate to any employee benefit plan," 29 U.S.C. § 1144(a), including state statutes

"that obligate[] an employer to establish an employee benefit plan," *Simas v. Quaker Fabric*

*Corp. of Fall River*, 6 F.3d 849, 852 (1st Cir. 1993).

The Severance Law does not obligate an employer to establish an employee benefit plan.

It is not enough that a state statute compels an employer to give "employee benefits"; to be

preempted, a statute must compel an employer to establish an "employee benefit *plan*[]." *Fort*

*Halifax*, 482 U.S. at 7.  ERISA defines an "employee benefit plan" as "employee pension benefit

plan" or, as relevant here, an "employee welfare benefit plan." 29 U.S.C. § 1002(3).  Among

other things, an "employee welfare benefit plan" is "any plan, fund, or program . . . maintained

by an employer. . . for the purpose of providing for its participants or their beneficiaries . . . any

benefit described in section 186(c)," *id.* § 1002(1), which includes "severance or similar

benefits," *id.* § 186(c).  A statute compels an employer to establish an employee welfare benefit

"plan" only when providing benefits would "require[] an ongoing administrative program to

meet the employer's obligation" under the statute. *Fort Halifax*, 482 U.S. at 11. Relevant factors include "whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria"; "whether the employer's undertaking or obligation requires managerial discretion in its administration"; and "whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits." *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 76 (2d Cir. 1996). The factors are not exclusive. *Okun v. Montefiore Med. Ctr.*, 793 F.3d 277, 278-79 (2d Cir. 2015).

On balance, the Severance Law likely does not obligate an employer to create a plan because it does not require an ongoing administrative program to deliver mandated severance pay. A program is not necessary to "analyze the circumstances of each employee's termination," *Schonholz*, 87 F.3d at 76, because compliance does not require an "individualized" assessment, *Okun*, 793 F.3d at 280. Rather, an employer need only determine whether a class of former employees were "laid off after March 1, 2020 due to a closure or a mass layoff." (Severance Law, § 1). Such "clerical determination[s]" do not require an administrative program. *James v. Fleet/Norstar Fin. Grp., Inc.*, 992 F.2d 463, 468 (2d Cir. 1993). Identifying a "closure" requires "no administrative scheme whatsoever." *Fort Halifax*, 482 U.S. at 12. And "[w]hile the classification of a layoff may entail some exercise of judgment," that judgment is not sufficient to turn a severance package into a plan. *Atkins v. CB&I, L.L.C.*, 991 F.3d 667, 671 (5th Cir. 2021).[1]

---

[1] A hotel that is a member of HANYC and has union employees is likely to have ready access to a list of laid-off employees. The operative collective bargaining agreement requires it to "keep a list of all employees laid off during the term of [the] [a]greement." (Dkt. No. 1-2, Art. 23(B).

The Hotel Association for New York City argues that an employer will also need to determine whether an employee was terminated for cause.  (*See* 21-CV-8321, Dkt. No. 23 at 8.) But the Severance Law does not require that.  Again, it mandates benefits to employees who were "laid off after March 1, 2020 due to a closure or a mass layoff."  (Severance Law, § 1.)  An employer need only determine whether termination reflected a "closure," meaning "the closure of a hotel to the public," or a "mass layoff," meaning a "reduction in force" of "75 percent or more of the employees engaged in hotel service" during "any 30-day period."  (Severance Law, § 1.)

Next, a program is not necessary to navigate any managerial discretion in administration. Plaintiff argues that a program is necessary to navigate decisions about an employee's eligibility for severance benefits.  (*See* Compl. ¶ 64.)  But to determine a laid-off employee's eligibility for severance pay, an employer need only determine whether the employee was employed "on March 1, 2020"; "had been employed" for at least one year "to perform hotel service"; and was not a "managerial, supervisory or confidential employee."  (Severance Law, § 1.)  Again, these are categorical, "clerical determination[s]."  *James*, 992 F.2d at 468.  They can be resolved through "a basic review of the employer's payroll system."  (21-CV-8321, Dkt. No. 14 at 9.) Indeed, that system is highly likely to classify employees as "managerial, supervisory or confidential," because an employer must track that information to comply with the National Labor Relations Act, *see NLRB v. Meenan Oil Co., L.P.*, 139 F.3d 311, 317, 319, 320 (2d Cir. 1998), and the Fair Labor Standards Act, *see Ramos v. Baldor Speciality Foods, Inc.*, 687 F.3d 554, 564 (2d Cir. 2012).  If there is some discretion in determining those classifications, it is not enough to reflect a plan.  *Cf. Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639, 651 (9th Cir. 2008).

8

Plaintiff also argues that an administrative program is necessary to navigate decisions about whether an employer must continue to pay an eligible employee over the lifetime of the statute.  (*See* Compl. ¶ 64.)  But to stop paying severance, an employer need only determine that a laid-off employee has been "recalled" (Severance Law, § 3(b)), or in the case of a closure, that the hotel has "reopen[ed] to the public" and "recalled 25 percent or more of its employees" (Severance Law, § 3(b)).  Tracking those objective facts is a "ministerial task" that does not give rise to an administrative program.  *Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan*, 95 F. Supp. 3d 402, 415 (S.D.N.Y. 2015); *see Hardy v. Adam Rose Ret. Plan*, 957 F. Supp. 2d 407, 416 (S.D.N.Y. 2013).  In any event, the Severance Law does not require an employer to make those determinations to comply with the statute; such provisions reflect safety valves to escape the mandate, so they cannot serve as the basis for finding a "plan."  *See Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 441-42 (5th Cir. 2006) (citing *Fort Halifax*, 482 U.S. at 11-12).

The Hotel Association for New York City further argues that a covered hotel employer needs an administrative program to decide how much severance pay to give an employee.  (*See* 21-CV-8321, Dkt. No. 14 at 9.)  But the Severance Law is clear: It mandates that an employer must pay "$500 in severance pay" each week, offset by "any severance or similar pay" provided or already owed for that week.  (Severance Law, §§ 2(a), 2(b).)  The law sets a $500 floor; to comply, the employer just has to pay at least $500 in severance pay each week in some form.  There is little discretion in that practice.  And any calculations involved require only "simple arithmetic" no more complex than "deduct[ing] . . . social security taxes, health and medical benefits, and 401k plans."  *James*, 992 F.2d at 467.  Thus, no administrative program is required.

Lastly, and most significantly, the Severance Law does not require an ongoing administrative program because it does not ask an employer to make "an ongoing commitment . . . to provide employee benefits." *Schonholz*, 87 F.3d at 76.  The law envisions a "one-time" project.  *See Fort Halifax*, 482 U.S. at 12.  It addresses the lingering effects of a global pandemic.  (*See* Compl. ¶¶ 22-24.)  It mandates payments on events that are "unlikely to recur on a regular basis," such as a "closing."  *Okun*, 793 F.3d at 280; *see Schonholz*, 87 F.3d at 76-77; *Fort Halifax*, 482 U.S. at 12.  It asks an employer to watch for those triggers, and to make those payments, only for "a short span of time."  *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 566 (2d Cir. 1998); *see James*, 992 F.2d at 466.  And the law has a clear end date: June 1, 2022.  (Severance Law, § 5.); *see Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 737 (2d Cir. 2001).  Whatever scheme the Severance Law requires, it is not one that reflects an ongoing "plan."

In sum, a hotel employer does not need an ongoing administrative program to comply with the Severance Law because an employer just has to make clerical determinations for a brief period.  The tests in this area of law approximate "the extent and complexity of administrative obligations."  *Simas*, 6 F.3d at 854.  Here, an employer can determine initial eligibility for severance pay in one fell swoop using basic records.  It merely needs to list its employees as of March 1, 2020; to identify the ones who had been there for at least a year; to strike out the "managerial, supervisory or confidential" employees; and to identify which employees were laid off when the hotel closed or began operating with a skeleton crew.  From there, it can determine continued eligibility from objective facts.  It just needs to track whether a hotel reopens or an employee returns.  It can determine the amount of severance pay with simple math.  It simply needs to pay eligible employees at least $500 in severance every week.  And it can rest assured

that after thirty weeks, the clerical project will end.  Because the Severance Law does not require

an employer to set up an ongoing administrative program, it does not mandate that an employer

establish an employee welfare benefits plan.  Accordingly, the Severance Law is likely not

preempted by ERISA.

### B.     NLRA Preemption

The National Labor Relations Act of 1935 "does not contain an express preemption

provision," so "the doctrine of labor law pre-emption concerns the extent to which Congress has

placed *implicit* limits on the permissible scope of state regulation of activity touching upon labor-

management relations."  *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 80

(2d Cir. 2018) (alterations and marks omitted).  Plaintiff invokes two implied preemption

doctrines: *Garmon* preemption and *Machinists* preemption.  Neither supports an injunction here.

### 1.     *Garmon* Preemption

Under *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959), a state statute is

preempted if it "regulate[s] activity that the NLRA protects, prohibits, or arguably protects or

prohibits."  *Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d 87, 95 (2d Cir. 2006).  The

Severance Law does not regulate such activity.  Broadly stated, the NLRA "protects workers'

rights to engage in concerted activity" and prohibits "unfair labor practices."  *Domnister v.

Exclusive Ambulette, Inc.*, 607 F.3d 84, 89 (2d Cir. 2010).  The Severance Law does not regulate

workers' rights.  Although a law that mandates a benefit "potentially limits an employee's right

to choose one thing by requiring that he be provided with something else, it does not limit the

rights of self-organization or collective bargaining protected by the NLRA."  *Metro. Life Ins. Co.

v. Massachusetts*, 471 U.S. 724, 758 (1985).

Nor does it compel an employer to engage in an unfair labor practice.  Plaintiff argues

only that the Severance Law compels covered hotel employers to violate Section 8(a)(5) of the

NLRA.  As the argument goes:  (1) Section 8(a)(5) makes it an "unfair labor practice" for an employer "to refuse to bargain collectively with the representatives of his employees."  29 U.S.C. § 158(a)(5).  (2) A "refus[al] to bargain collectively" includes the unilateral "terminat[ion]" or "modif[ication]" of a collective bargaining agreement.  *Id.* § 158(d); *see N.L.R.B. v. Katz*, 369 U.S. 736, 743 (1962).  And (3) the law compels covered hotel employers to modify their collective bargaining agreements.  (*See* Compl. ¶¶ 88-89.)  That logic fails because the NLRA provides that "no party to such contract shall terminate or modify such contract," not that the state may not do so.  29 U.S.C. § 158(d).  Indeed, "the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of preemption," because "there is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues . . . that may be the subject of collective bargaining."  *Fort Halifax*, 482 U.S. at 21-22 (quotation marks omitted).

Moreover, nothing in the record here suggests that an employer would have to modify any provision of the relevant collective bargaining agreement to comply with the Severance Law. The statutory obligations merely supplement the contractual ones.  For example, under the operative collective bargaining agreement, an employer is generally obligated by contract to pay union employees "an amount equal to four (4) days of regular wages for each year of service" in "the event of termination resulting from the closing of a hotel."  (Dkt. No. 20-2 ("Industry-Wide Agreement"), Art. 52.)  The Severance Law does not nullify that obligation.  It just provides that if the contractual severance does not amount to $500 a week, an employer has to make up the difference.  (*See* Severance Law, § 2(b).)  To be sure, the parties could negotiate a collective bargaining agreement in the future that is in greater tension with the Severance Law.  But "[s]etting a floor below which the employer cannot fall, in advance, in no way prevents a

subsequent, full-throated bargaining between union and employer, and it is certainly not a unilateral change of an existing term or condition of employment." *Cortese v. Skanska Koch, Inc.*, 544 F. Supp. 3d 456, 465 (S.D.N.Y. 2021) (citation and marks omitted). Accordingly, the Severance Law is not preempted under *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959).

### 2.    *Machinists* Preemption

Plaintiff also argues that the Severance Law is preempted under *Lodge 76 Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm'n*, 427 U.S. 132 (1976). Under *Machinists*, "even regulation that does not actually or arguably conflict with the provisions . . . of the NLRA may interfere with the open space created by the NLRA for 'the free play of economic forces.'" *Pataki*, 471 F.3d at 107 (quoting *Machinists*, 427 U.S. at 140). Accordingly, a state statute is preempted if it "intrud[es] upon the labor-management bargaining process." *Ass'n of Car Wash Owners*, 911 F.3d at 81 (alterations and marks omitted). The "crucial inquiry" is whether state action "frustrate[s] effective implementation of the [NLRA's] processes." *Id.* at 82 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 (1986)).

The Severance Law does not frustrate those processes. For one, it is not "designed to encourage or discourage employees in the promotion of their interests collectively." *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 85 (2d Cir. 2015). The law, by its terms, yields the same severance payment for union and nonunion employees during its effective period: $500 a week. (*See* Severance Law, §§ 2(a), (b).) Plaintiff argues that the Severance Law in effect provides unique "benefits . . . to union employees" (Compl. ¶ 78), because union employees have already received severance payments under the operative collective bargaining agreement (Compl. ¶ 79), and are promised severance payments under the agreement if a hotel is

13

converted (Compl. ¶ 80).  But the collective bargaining agreement sets those incentives, and the Severance Law does not affect them.  Separately, Plaintiff argues that the law provides unique "protections to union employees" (Compl. ¶ 78) because it states that it does "not affect the right, if any, of a covered hotel service employee to be recalled to their previous position" (Severance Law, § 2(d)).  That provision does not grant a protection; it disclaims one.  The law, by its terms, is neutral.

The Severance Law also does not "encourage []or discourage the collective bargaining process[]."  *Metro. Life*, 471 U.S. at 755.  Plaintiff argues that the law "was prompted by the Union" for hotel employees.  (Compl. ¶ 72.)  Lobbying, however, "is present 'with regard to any state law that substantively regulates employment conditions,'" and is not grounds for preemption.  *Concerned Home Care Providers*, 783 F.3d at 87 (quoting *Fort Halifax*, 482 U.S. at 21).  Plaintiff further emphasizes that the Mayor and City Council Members made statements supporting unions.  (*See* Compl. ¶ 72.)  But their intent is not relevant to *Machinists* preemption.  *See Rest. L. Ctr. v. City of New York*, 360 F. Supp. 3d 192, 237 (S.D.N.Y. 2019).  Plaintiff asserts that the law rewards the Union with "terms and conditions that [the Union] did not and could not obtain under . . . the collective bargaining process."  (Compl. ¶ 73.)  But "*Machinists* preemption is not a license for courts to close political routes to workplace protections simply because those protections may also be the subject of collective bargaining."  *Concerned Home Care Providers*, 783 F.3d at 87.

Nor does the Severance Law regulate the collective bargaining process itself.  A state statute typically frustrates the NLRA's processes only if it regulates the use of "economic weapons of self-help, such as strikes and lockouts."  *Rondout Elec., Inc. v. NYS Dep't of Lab.*, 335 F.3d 162, 167 (2d Cir. 2003).  The Severance Law, like other laws that mandate benefits,

does not deny employees or employers any economic weapon, or provide employees or employers with any economic weapon. *See, e.g.*, *Fort Halifax*, 482 U.S. at 20 (upholding severance mandate in part because it did not "force a party to forgo the use of one of its economic weapons"); *Rondout Elec.*, 335 F.3d at 169 (upholding prevailing wage mandate in part because it did not "eliminate particular bargaining tools"); *Rest. L. Ctr.*, 360 F. Supp. 3d at 237 (upholding payroll deduction mandate in part because it did not deny any economic weapon).

At most, the Severance Law "fix[es] a minimum" for a kind of post-termination compensation. *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 85 (2d Cir. 2015). Setting a minimum may "restrict[] the terms over which employer and employees may negotiate," but it does not undermine the NLRA, because the NLRA is not concerned with the "particular substantive terms of the bargain that is struck." *Id.* (upholding statute setting a "total compensation floor"); *see Metro. Life*, 471 U.S. at 727 (upholding statute setting a minimum for mental health care benefits); *Rest. L. Ctr.*, 360 F. Supp. at 237 (upholding statute setting a minimum deduction). As the Severance Law does not affect the NLRA's processes, it is not preempted by the NLRA.

In addition, the Severance Law is not preempted because it is a minimum labor standard. A "minimum labor standard" is not preempted under *Machinists*. *Metro. Life*, 471 U.S. at 755. That is because it merely "set[s] a baseline for employment negotiations," *Concerned Home Care Providers*, 783 F.3d at 85, in the same way that traditional "rights under state law" do, *Fort Halifax*, 482 U.S. at 21. A minimum labor standard typically "give[s] specific minimum protections to individual workers" and "affect union and nonunion employees equally." *Concerned Home Care Providers*, 783 F.3d at 85 (quoting *Metro. Life*, 471 U.S. at 755.) It

reflects the "broad authority under [a state's] police powers to regulate the employment relationship." *Id.*

      The Severance Law has all the markers of a minimum labor standard.  It sets minimum severance pay for laid-off workers irrespective of their union status.  (*See* Severance Law, §§ 1, 2(a), 2(b).)  As already explained, it affects union and nonunion workers equally.  And, as a "severance payment law," it reflects an "unexceptional exercise of the [State's] police power." *Fort Halifax*, 482 U.S. at 22.  Accordingly, the Severance Law is "a valid exercise of New York [City's] authority to set minimum labor standards." *Concerned Home Care Providers*, 783 F.3d at 85.

      Plaintiff argues that the Severance Law does not enact a minimum labor standard because it is not generally applicable, as it only obligates a subset of employers within one industry to make payments to a subset of employees.  (*See* Compl. ¶ 76.)  But a state statute can craft minimum labor standards for "particular industries," *Concerned Home Care Providers*, 783 F.3d at 86 ("home care"), particular employers, *see Rondout Elec.*, 335 F.3d at 164 ("contractor[s] or sub-contractor[s] engaged in the performance of any public work"), and particular employees, *see Fort Halifax*, 482 U.S. at 5 ("employees who have worked in the plant at least three years"). The Severance Law sets a minimum severance package for tens of thousands of laid-off hotel employees from still-closed hotels.  (*See* Dkt. No. 32-1 at 24.)  It is no more "finely targeted" than the City's Wage Parity Law, a minimum labor standard that "set[] a minimum rate of compensation for the hundreds of thousands of home care aides who provide Medicaid-covered care in New York City and the surrounding Counties." *Concerned Home Care Providers*, 783 F.3d at 86.

Finally, Plaintiff argues that the Severance Law does not enact a minimum labor standard because its mandate is more than "minimal."  (Compl. ¶ 82.)  But the Second Circuit has not adopted that standard.  *See Concerned Home Care Providers*, 783 F.3d at 86 n.8.  It has suggested instead that the "additional cost" from a mandate has no bearing on preemption. *Rondout Elec.*, 335 F.3d at 168.  In any event, the Severance Law is no more burdensome than other minimum labor standards that set a minimum severance package, *see Fort Halifax*, 482 U.S. at 5, minimum health care benefits, *see Metro. Life*, 471 U.S. at 727, minimum compensation, *see Concerned Home Care Providers*, 783 F.3d at 86, or a minimum prevailing wage, *see Rondout Elec.*, 335 F.3d at 169.  Accordingly, the Severance Law is not preempted under *Lodge 76 Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm'n*, 427 U.S. 132 (1976).

### C.      Contracts Clause Claim

The Contracts Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. art. I, § 10, cl. 1.  And yet, "not all laws affecting pre-existing contracts violate the Clause."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  A state law violates the Contracts Clause only if it "has 'operated as a substantial impairment of a contractual relationship.'"  *Id.* at 1822 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).  Even then, a state law will be upheld if it is "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Id.* (quoting *Energy Reserves Grp. Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983)).

#### 1.      Substantial Impairment

It is not likely that the Severance Law substantially impairs a contractual relationship here.  It stands to reason that any claim under the Contracts Clause "must initially identify an impaired 'contractual relationship,' . . . under which the plaintiff has rights."  *Domino's Pizza,*

*Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (analyzing 42 U.S.C. § 1981 claim).  Plaintiff has

not made a showing that it has rights under any contractual relationship.  The only contract that

Plaintiff has alleged to be impaired is a collective bargaining agreement between the New York

Hotel and Motel Trades Council, AFL-CIO and the Hotel Association of New York City, Inc.

(*See* Compl. ¶ 7.)  But it is not clear that Plaintiff is a party to this contract.  (*Id.*)  Plaintiff

alleges that it owns the Roosevelt Hotel, but it does not allege that the Hotel is a member of

HANYC (*see* Compl. ¶ 1), and it could not make that representation at the motion hearing (*see*

Dkt. No. 34, at 21:22-22:2).  Plaintiff further alleges that the Roosevelt Hotel is operated by a

management company named Interstate Hotels, LLC, but it does not allege that Interstate is a

member of HANYC either.  (*See* Compl. ¶ 2.)  Plaintiff does not argue that it is a third-party

beneficiary of the contract.  And it is not clear that Plaintiff would be one if it is not a member of

HANYC, because although Plaintiff alleges that Roosevelt Hotel has union employees, it also

alleges that Interstate is their sole employer.  (*See id.*)  At bottom, Plaintiff alleges that it "fund[s]

. . . the amounts due to employees for wages and/or other compensation."  (Compl. ¶ 2.)  That

fact, without more, is not enough to show that Plaintiff has rights or obligations under the

collective bargaining agreement.  Uncertainty about Plaintiff's contractual rights counsel against

a preliminary injunction here.

    In any event, the Severance Law likely does not impair any contractual bargain.  To

assess a purported impairment, courts consider "the extent to which the law undermines the

contractual bargain, interferes with a party's reasonable expectations, and prevents the party

from safeguarding or reinstating [its] rights."  *Melendez v. City of New York*, 16 F.4th 992, 1032-

33 (2d Cir. 2021) (quoting *Sveen*, 138 S. Ct. at 1822).  Plaintiff argues that the Severance Law

undermines the collective bargaining agreement in three ways.

First, Plaintiff argues that the law "impairs . . . [the collective bargaining agreement]'s provision regarding the amount and duration of severance pay." (Compl. ¶ 104.) But the Severance Law does not "repudiate[e]" any obligation in the collective bargaining agreement relating to severance pay. *Id.* at 1034. In "the event of termination resulting from the closing of a hotel," an employer remains obligated by contract to pay union employees "an amount equal to four (4) days of regular wages for each year of service." (Industry-Wide Agreement, Art. 52.) The Severance Law merely supplements that contractual obligation with a statutory obligation. *See Rhode Island Hosp. Ass'n v. City of Providence ex rel. Lombardi*, 667 F.3d 17, 41 (1st Cir. 2011) (finding no impairment where a provision "remain[ed] fully operative under the Ordinance").

Plaintiff argues that the law nonetheless frustrated its expectation that it would not have to "pay more" than its contractual severance obligation to laid-off employees. (Compl. ¶ 104.) But such an expectation likely was not reasonable. When the parties negotiated severance pay, they "operate[d] in an area already subject to state regulation at the time." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978). The state authority to require employers to pay a minimum compensation package was "well established," *id.* at 413; *see, e.g.*, *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 400 (1937), including a minimum severance package, *see Fort Halifax*, 482 U.S. at 7; 26 M.R.S.A. § 625-B, and the hotel industry was "heavily regulated," *Energy Rsrvs. Grp.,* 459 U.S. at 413; *see, e.g.*, 12 N.Y.C.R.R. § 146 ("Hospitality Industry Wage Order"). A severance mandate was therefore foreseeable, and thus incorporated into the parties' bargain. *See Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020); *cf. California Grocers Ass'n v. City of Long Beach*, No. 21-CV-524, 2021 WL 3500960, at *5 (C.D. Cal. Aug. 9, 2021) (finding no impairment from a "mandat[e] that all grocery workers in the area

must be paid four dollars ($4.00) more than their hourly wage for a period of at least 120 days" because "[o]ther minimum labor standards impact the grocery industry and the parties could have foreseen additional regulation").

Plaintiff suggests that it was at least reasonable to think that it would not have to give a second severance package to employees who had already received one. (*See* Compl. ¶ 107.) That may well be the case. But it is not clear that Plaintiff bargained for that expectation. The parties bargained over an initial severance package. (*See* Industry-Wide Agreement, Art. 52.) That severance package was "adequate when made" and remains adequate under the Severance Law. *Allied Structural Steel*, 438 U.S. at 246. Moreover, any impairment of that expectation is not substantial. Where it is foreseeable that a state may enact an obligation prospectively, and the only expectation frustrated is that a state imposed an obligation after initial performance, the "severity of an impairment" is measured by reliance interests. *Id.* at 245. Significantly, Plaintiff has not shown — or even alleged — that it organized its affairs differently on the expectation that its first severance package would also be its last (*see, e.g.*, Compl. ¶¶ 104, 107) and that it did so to its detriment. *Cf. Allied Structural Steel*, 438 U.S. at 246 (invalidating statute where company "relied heavily, and reasonably, on [a] legitimate contractual expectation in calculating its annual contributions to [a] pension fund"). In all likelihood, Plaintiff would have given the same initial severance package, because that is what the collective bargaining agreement required, and the Severance Law does not direct otherwise. Plaintiff emphasizes that the law introduces a new "financial burden[]." (Compl. ¶ 104.) But that is true of all minimum compensation laws, mandatory benefits laws, and severance mandates. On this record, Plaintiff has not shown that the Severance Law substantially impairs any contractual relationship relating to the amount and duration of severance pay.

Second, Plaintiff argues that the Severance Law impairs the collective bargaining agreement's provision governing what severance pay is due when "a signatory Hotel is converted to residential use." (Dkt. No. 30 ("Supp. Memo") at 6; Industry-Wide Agreement, Art. 57.) However, Plaintiff has stated that it has no plans to "transition the Roosevelt to an alternative use" (Compl. ¶ 21; Dkt. No. 21 ("Ghaffar Decl.") ¶ 6), so that purported impairment does not affect Plaintiff.

Third, Plaintiff argues that the Severance Law impairs the collective bargaining agreement's arbitration provision, because it "grant[s] employees a private cause of action [under the Severance Law] with double damages and attorney's fees." (Compl. ¶ 105.) But a party to an arbitration agreement may compel arbitration on a statutory claim even when a statute creates a private cause of action and "describe[s] the details of [that] cause[] of action, including the relief available, in the context of a court suit." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 100 (2012). Accordingly, the law's private right of action does not impair the arbitration clause either, and Plaintiff has not shown any substantial impairment of the collective bargaining agreement.

### 2.      Significant and Legitimate Public Purpose

Even if the Severance Law substantially impairs the collective bargaining agreement, the law still does not violate the Contracts Clause, because it is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose. *See Sveen*, 138 S. Ct. at 121. For laws affecting private contracts, the assessment of "purpose and means" varies with "the degree of contract impairment." *Melendez*, 16 F.4th at 1035. Where, as here, any impairment is not severe, it is generally appropriate to defer to the government's "conclusion that its approach reasonably promotes the public purposes for which the ordinance was enacted." *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998); *see CFCU Cmty.*

*Credit Union v. Hayward*, 552 F.3d 253, 266 (2d Cir. 2009); *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006).  Regardless, the law survives even the more searching review that follows a severe impairment — "a careful examination of the nature and purpose" of the legislation.  *Melendez*, 16 F.4th at 1035.

There can be no dispute that the law aims at a significant and legitimate public purpose. "[T]he COVID-19 pandemic . . . prompted a serious economic, as well as health, emergency in New York City."  *Melendez*, 16 F.4th at 1036.  It "put[] hotel workers in a precarious state" and left "the hotel industry . . . in dire straits."  (Dkt. No. 32-1 at 25.)  The law aims to mitigate these effects by "protecting [hotel] workers' livelihoods" and facilitating "economic recovery."  (Dkt. No. 32-2 at 16:4-6.).  "[C]ontrolling precedent recognizes the mitigation of economic emergencies as a public purpose that can support contract impairment."  *Melendez*, 16 F.4th at 1036.

Plaintiff argues that the Severance Law only "benefits certain hotel employees" (Compl. ¶ 108), so it does not address "a broad, generalized economic or social problem," *Allied Structural Steel Co.*, 438 U.S. at 242.  But the two are not mutually exclusive.  The Severance Law benefits certain hotel employees, and by doing so, addresses a broad economic problem: economic distress caused by the pandemic.  That focus remains even if the law does not address every instance.  *Cf. California Grocers Ass'n*, 2021 WL 3500960, at *5 (upholding wage law for grocers because "[t]he pandemic thrust grocers into an essential and hazardous position, and the City designed the Ordinance to 'protect[] public health, support[] stable incomes, and promote[] job retention'").

Further, the Severance Law is designed so that the benefits to hotel employees serve as an incentive for hotels to take other actions, thereby addressing other broad economic problems.

*Cf. Melendez*, 16 F.4th at 1037.  Specifically, the law is designed to encourage hotels to reopen, where they would then "recall workers," "increase[] safety measures," "accommodate increased travel . . . needs," and attract tourists, thereby "revitaliz[ing] . . . New York City's hotel industry."  (Dkt. No. 32-2 at 16:4-1.)  A revitalized hotel industry would help hotels "stay afloat" and increase "tax revenues."  (Dkt. 32-1 at 25.)  That interest in economic recovery is significant and legitimate.  *Cf. San Diego Cnty. Lodging Ass'n v. City of San Diego*, No. 20-CV-2151, 2021 WL 4209437, at *6 (S.D. Cal. Sept. 16, 2021) (upholding law that gave "building service, hospitality, and travel-related workers who were discharged, laid off, or furloughed because of the COVID-19 pandemic" a "right to return to their previous jobs" because the law was adopted "to aid economic recovery"); *see also Energy Rsrvs. Grp.*, 459 U.S. at 416-17 (finding that "protect[ing] consumers from the escalation of natural gas prices" is a legitimate public interest); *Sullivan*, 959 F.3d at 65 (finding that acting "to alleviate . . . a fiscal crisis . . . is a legitimate public purpose"); *Buffalo Tchrs. Fed'n*, 464 F.3d at 369 (finding that "addressing a fiscal emergency is a legitimate public interest").

### 3.      Appropriate and Reasonable Means

It is also likely that the Severance Law is an appropriate and reasonable means to further the government's interests in protecting workers' livelihoods and facilitating economic recovery. In conducting a "careful examination" of reasonableness, a court considers factors like the "extent of impairment," the "record basis" that "link[s] purpose and means," and "tailor[ing]." *Melendez*, 16 F.4th at 1029, 1038-1047.  These factors and others reflect the reasonableness of the statute.

Putting aside expectations, the Severance Law is not so severe as to be unreasonable. Where the law applies, a hotel must pay the mandated severance, and that money cannot be recovered.  *See id.* at 1038-39.  But it can avoid further payments by recalling an employee, or in

the case of a closed hotel, reopening and recalling a quarter of its employees (*see* Severance Law § 3(b)) so the hotel employer can "reinstat[e] his rights." *Melendez*, 16 F.4th at 1033.  In addition, the law expires on June 1, 2022.  (*See* Severance Law § 5.)  The law is therefore "a temporary measure" that imposes an obligation for months at most.  *Energy Rsrvs. Grp.*, 459 U.S. at 418; *cf. San Diego Cnty. Lodging Ass'n*, 2021 WL 4209437, at *7 (upholding ordinance on part on the grounds that it "is a temporary measure to address a temporary, but ongoing issue").

Plaintiff objects that the law does not "compensate[e]" hotels for the impairment of contractual expectations.  (Compl. ¶ 113.)  But compensation is not "always necessary to defeat a Contracts Clause challenge," *Melendez*, 16 F.4th at 1046, especially where, as here, the law is a benefits mandate that at most impairs expectations.  In any event, the law does allow a hotel to offset the mandate by other "severance or similar pay provided or owed" where statutory and contractual obligations overlap.  (Severance Law, § 2(b).)  The law is not unduly severe.

The legislative record also links the law to both of its purposes.  First, it reflects a basis for the legislature to pass the Severance Law to protect "workers' livelihoods."  (Dkt. No. 32-2 at 16:4-6.)  There was evidence of a risk to workers' livelihoods: sixty percent of hotel workers were unemployed.  (Dkt. No. 32-1 at 25; Dkt. No. 32-5 at 19.)  And as members of the public testified, for many hotel workers, "unemployment [benefits] ha[d] exhausted," so they "need[ed] to make money to take care of [their] household."  (Dkt. No. 32-5 at 60:6-61:10; *see id.* at 61:16-62:8 ("Since [my] unemployment [benefits] ended . . . it[ has] been really hard for me and my family to make ends meet since being laid off from my job."), 71:9-72:5 ("Now that they removed . . . the unemployment [benefits] from us, I really don't know how I'm going to . . . support my kids, pay my rent.  Just live in general."), 75:8-76:3 ("Without unemployment

insurance or my job back, I'm worried that we will have to pull my daughter out of school because I cannot afford to help her anymore."), 76:9-21 ("[M]y unemployment insurance benefits have suddenly stopped . . . [and] I am very worried about being able to take care of my family and my daughter.").)

There was also reason to think that the Severance Law would reduce the risks for workers. In general, the law mandates that a hotel employer "provide to each covered employee $500 in severance pay" each week unless that employee is "recalled." (Severance Law, §§ 2(a), 2(b).) The law thus guarantees that an unemployed hotel worker will receive either a stipend or a job. (*See* Dkt. No. 32-5 at 16:12-17 ("[H]otels can choose to either restore at least part of their workforce and available rooms or pay moderate severance to workers that continue . . . to experience unemployment.").) The legislature had a basis to think that both outcomes would alleviate economic distress; indeed, it heard testimony from an official from the New York City Department of Consumer and Worker Protection that "job stability, both in terms of income and scheduling, is key to improving the economic lives of New Yorkers." (Dkt. No. 32-2 at 24:4-10.) Accordingly, the legislature had a basis to conclude that the law would protect workers' livelihoods. *Cf. Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 914 (9th Cir. 2021) (upholding ordinance in part because protections were "necessary to avoid displacing residential tenants amidst a pandemic" and fees could "caus[e] them to self-evict or be evicted").

Plaintiff argues that the Severance Law is not appropriately tailored to that interest because it obligates hotels to pay severance even to workers who had "found other sources of income." (*See* Compl. ¶ 111.) But the size of that class is unclear. The record reflects that sixty percent of hotel workers are unemployed. (Dkt. No. 32-1 at 25; Dkt. No. 32-5 at 19.) Of the

remaining forty percent, it is not clear how many were laid off, how many were recalled, and how many were hired away.  Plaintiff does not submit evidence to answer that question.  In any event, although "the fact that [a law] is not conditioned on need" may sometimes be concerning, *Melendez*, 16 F.4th at 1043, that is not the case here, where it is apparent why the City could not mandate benefits that way.  If a laid-off worker were eligible only upon a "showing of need" (Compl. ¶ 111), then a hotel employer would have to develop a highly discretionary administrative scheme to assess "need."  If a laid-off worker were ineligible if it "obtained other employment," "became eligible for social security and/or retirement benefits," or otherwise "found other sources of income" (Compl. ¶ 111), then a hotel employer would have to develop an ongoing administrative scheme to monitor laid-off employees, other employers, and administrative agencies.  In either case, the law would likely be preempted under ERISA.  *See Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 76 (2d Cir. 1996) (preempting state law where eligibility turned in part on "whether the employee was making a reasonable and good faith effort to obtain suitable employment elsewhere").  Because the Severance Law could not be more narrowly tailored, it was appropriate.

Second, the record reflects a basis for the legislature to think that the law would facilitate "economic recovery."  (Dkt. No. 32-2 at 16:4-6.)  It had a record reflecting the difficult economy post-pandemic: tourism had "steeply declin[ed] in the City"; "the City's tourism industry had diminished substantially"; and those effects had "been felt acutely by the hotel industry," leaving the hotel industry "in dire straits."  (Dkt. No. 32-5 at 17-19.)  But the legislature had reason to think that the Severance Law would improve the economy.  The law requires a hotel employer to provide $500 in severance pay a week, but a hotel that "experienced a closure" need not pay such severance once it "reopens to the public and has recalled 25% or more of its employees

employed as of March 1, 2020." (Severance Law, § 3(b).)  In this way, the law "incentivize[s] an incremental reopening." (Dkt. No. 32-2 at 16:12-22.)  The legislature reasoned that a reopening would align incentives for hotels to "recall[] workers," "increase[] safety measures," "accommodate increased travel . . . needs," and attract tourists, thereby "revitaliz[ing] . . . New York City's hotel industry." (Dkt. No. 32-2 at 16:4-11.)  Again, it heard testimony from an official at the New York City Department of Consumer and Worker Protection that "job stability, both in terms of income and scheduling, is key to improving the economic lives of New Yorkers." (Dkt. No. 32-2 at 24:4-10); *cf. San Diego Cnty. Lodging Ass'n*, 2021 WL 4209437, at *7 (upholding ordinance where council determined that "the economy may better recover if impacted workers can return to their previous jobs").  Accordingly, the legislature had a basis to think that the law would facilitate economic recovery.

Plaintiff suggests that the Severance Law is not a reasonable way to facilitate recovery because it "extract[s] . . . payments" from "[r]ational hotel owners." (Compl. ¶ 129.)  Although the "allocation of . . . economic burden" is sometimes relevant to reasonableness, here, the burden "was tailored to the party" with the power to change the status quo. *Melendez*, 16 F.4th at 1042.  The City seeks to have hotel workers rehired and hotels reopened; hotels have the power to recall workers and reopen hotels.  Accordingly, it is reasonable for the Severance Law to pressure them. *Cf. San Diego Cnty. Lodging Ass'n*, 2021 WL 4209437, at *7 (upholding ordinance that "require[d] large employers, (e.g., owners of hotels with over 200 guest rooms) in the sectors of the local economy most impacted by the pandemic to offer open positions to" laid-off employees).

Finally, Plaintiff raises a series of policy disagreements.  It argues that the mandated severance pay is far "too much" for "far too long." (Compl. ¶ 111.)  It warns that there will be

"significant negative consequences on the finances of" hotels.  (Compl. ¶ 126.)  It objects that

the statute draws bright lines.  (*See* Compl. ¶ 123.)  "[W]hether the legislation is wise or unwise

as a matter of policy is a question with which we are not concerned."  *Sullivan*, 959 F.3d at 69.

The legislature is entitled to be bold, to take risks, and to draw lines, so long as it enacts a law

that is an appropriate means reasonably tailored to legitimate ends.  The Severance Law is such a

law.  Accordingly, it is not likely that it violates the Contracts Clause.

> ### D.   Due Process Clause Claims

Plaintiff is also not likely to succeed on any claim that the Severance Law violates the

Due Process Clause of the Fourteenth Amendment.

> #### 1.   Vagueness Claim

Plaintiff asserts that the Severance Law is impermissibly vague because it "does not

provide . . . adequate . . . notice about who is eligible to receive the severance payments."

(Compl. ¶ 115.)  That claim is not likely to succeed because the law provides that an employee is

eligible if he was "employed by [a covered] hotel on March 1, 2020"; had been employed at the

time for at least a year "to perform hotel service"; was not at the time a "managerial, supervisory

or confidential employee and did not otherwise exercise control over the management of [the]

hotel"; and was "laid off after March 1, 2020 due to a closure or a mass layoff."  (Severance

Law, § 1.)  That description gives "people of ordinary intelligence a reasonable opportunity to

understand what conduct it prohibits."  *Melendez*, 16 F.4th at 1015 (quoting *Hill v. Colorado*,

530 U.S. 703, 732 (2000)).  Plaintiff argues that the statute does not define "confidential

employee."  (Compl. ¶ 16.)  But it does not need to do so; in the labor relations context, a

"confidential employee" is "an employee who acts in a confidential capacity with respect to an

individual who formulates or effectuates management policies in the field of labor-management

relations."  22 U.S.C. § 4102.  Such employees, for example, represent management at meetings.

*See, e.g.*, *Reeves v. City of Yonkers*, 348 F. Supp. 3d 264, 278 (S.D.N.Y. 2018); *Alberti v. Cnty. of Nassau*, 393 F. Supp. 2d 151, 170 (E.D.N.Y. 2005).

Plaintiff also argues that the Severance Law is impermissibly vague because it "does not provide . . . adequate . . . notice about . . . how much each eligible employee is entitled to receive." (Compl. ¶ 115.)  But again, the law states that a covered hotel employer must provide "$500 in severance pay," offset by "any severance or similar pay provided or owed for [the relevant] week[s]." (Severance Law, §§ 2(a), (b).)  A person of ordinary intelligence understands that the provision sets a floor for severance pay at $500 each week for the effective period, and an employee must end each week with $500 in severance pay in some form.  Plaintiff emphasizes that the statute does not define "similar pay" that may be used to offset, but that phrase just indicates that severance pay remains severance pay even if it goes by another name.

Lastly, Plaintiff asserts that the Severance Law "facilitates and even invites arbitrary or discriminatory conduct." (Compl. ¶ 116.); *see Melendez*, 16 F.4th at 1015 (quoting *Hill*, 530 U.S. at 732.  Such allegations are conclusory.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2. Substantive Due Process Claim

Separately, Plaintiff asserts that the Severance Law violates substantive due process because it deprives employers of "a substantial property interest," but it is "not rationally related to a legitimate public purpose." (Compl. ¶¶ 116.)  A statute "adjusting the burdens and benefits of economic life" is presumptively constitutional, and "the burden is on one complaining of a [substantive] due process violation to establish that the legislature has acted in an arbitrary and irrational way."  *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. at 15.  For the reasons discussed above, the Severance Law is not arbitrary or irrational; it is rationally related to a legitimate purpose.

### E.    Equal Protection Claim

The Equal Protection Clause "embodies a general rule that States must treat like cases alike, but may treat unlike cases accordingly." *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)). Plaintiff does not allege that it is a member of a protected class; instead, it pursues a "class of one" theory. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To succeed, Plaintiff will have to show "that [it] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.*

Plaintiff is not likely to succeed on a "class of one" theory because Plaintiff has not identified that it has been treated differently from any "others similarly situated." On a class of one theory, a plaintiff must first "establish that [it] and a comparator are '*prima facie* identical.'" *Hu. v. City of New York*, 927 F.3d 81, 82 (2d. Cir. 2019) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)). To do so, a plaintiff must establish that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify . . . differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.*

Plaintiff argues that it has been treated differently from New York City businesses in the "dining, arts and entertainment, construction," and "airline" industries, even though those businesses also "suffered during the pandemic" and "had to lay off employees." (Compl. ¶ 134.) But Plaintiff has not submitted evidence that they did so to the same degree (*see* Dkt. No. 32-5 at 19), that those businesses remain closed (*see* 21-CV-8321, Dkt. No. 22 ("Dandapani Declaration") ¶ 6), or that 60% of their workers remain unemployed (*see* Dkt. No. 32-5 at 19). It was rational for the legislature to focus on the hotel industry given the evidence before it.

Plaintiff further argues that it has been treated differently from other New York City hotels because the Severance Law does not apply to hotels with fewer than a hundred rooms. (*See* Severance Law, § 1.)  But smaller hotels do not employ as many workers, so their severance payments support fewer people.  And they do not have as many guests, so it is not as important to the hospitality industry that they reopen.  Accordingly, it is not irrational to exclude them.

### F.      State-Law Claims

Finally, in its complaint Plaintiff asserts two preemption claims under state law: that the Severance Law is preempted by New York State's comprehensive schemes for regulating unemployment benefits, *see* N.Y.L.L. §§ 550-51; and labor relations, *see* N.Y.L.L. § 700.  (*See* Compl. ¶¶ 92-100, 144-147.).

Because Plaintiff is not likely to succeed on the merits of any federal claim, it is not likely that the Court will retain supplemental jurisdiction over the remaining state law claims.  In the "early stages of litigation," *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006), "judicial economy, convenience, fairness, and comity" are likely to counsel in favor of dismissing those claims without prejudice to refiling in state court, *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 81 (2d Cir. 2018).  Accordingly, Plaintiff's state-law claims cannot serve as a basis to issue a preliminary injunction at this time. *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003); *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 788 (W.D.N.Y. 2020) (declining to consider "state-law claims in the context of Plaintiffs' request for injunctive relief" because the court "would decline to exercise supplemental jurisdiction").

In any event, even if the Court were to consider these claims it would conclude that they are unlikely to succeed on the merits.  "It has long been recognized that under home rule, [the City] has broad policing power to act in furtherance of the welfare of its citizens." *Ctr. for*

*Independence of the Disabled v. Metro. Transp. Auth.*, 184 A.D.3d 197, 202 (1st Dep't 2020).
The general police power of local governments is "construed liberally in New York." *N.Y. Pet Welfare Ass'n v. City of N.Y.*, 850 F.3d 79, 92-93 (2d Cir. 2017). Given the City's strong interest in promoting economic welfare during a pandemic, the Severance Law is likely within its broad home rule powers. Nor is the Severance Law likely preempted by New York State unemployment insurance law or labor law. Neither Plaintiff nor the Hotel Association of New York City points to a specific conflict between either of those state laws and the Severance Law, nor do they city any authority for the proposition that state law is intended to "occupy the field" in either of those areas. *See Eric M. Berman, P.C. v. City of New York*, 25 N.Y.3d 684, 690 (2015). In any event, because severance pay is distinct from unemployment insurance and labor law, the Severance Law likely would be held to involve regulation of a separate field. *See, e.g., id.* at 691.

**IV.   Conclusion**

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is DENIED.

The Clerk of Court is directed to close the motion at Docket Number 19.

SO ORDERED.

Dated: March 30, 2022
New York, New York

J. PAUL OETKEN
United States District Judge